# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 18-453

STATE OF LOUISIANA

VERSUS

JEFFERY WAYNE ROSS

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTY-FIFTH JUDICIAL DISTRICT COURT
PARISH OF GRANT, NO. 17-802
HONORABLE WARREN DANIEL WILLETT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## ELIZABETH A. PICKETT
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Shannon J. Gremillion, and John E. Conery, Judges.

**AFFIRMED IN PART, VACATED IN PART.**

**Gremillion, J., concurs in part and dissents in part, and assigns reasons.**

**Conery, J., concurs in part and dissents in part and assigns reasons.**

**Annette Fuller Roach**
**Louisiana Appellate Project**
**P. O. Box 1747**
**Lake Charles, LA 70602-1747**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT-APPELLANT:**
    **Jeffery Wayne Ross**

**Hon. James Patrick Lemoine**
**District Attorney, Thirty-fifth Judicial District**
**James D. White, Jr.**
**Assistant District Attorney**
**P. O. Box 309**
**Colfax, LA 71417-0309**
**(318) 627-3205**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**PICKETT, Judge.**

## FACTS

On September 19, 2017, the defendant, Jeffery Wayne Ross, and the victim, Billy Gillette, had a confrontation regarding an incident on Highway 167 in Grant Parish. The confrontation culminated in the defendant running the victim over with his Mercedes Benz SUV and dragging him several yards. Believing the defendant was backing up to run over him again, the victim began shooting at the defendant's car. The victim survived the incident and was taken to the hospital where he subsequently underwent surgery for his injuries.

On October 13, 2017, the defendant was charged by bill of information with one count of attempted second degree murder, a violation of La.R.S. 14:27 and 14:30.1, and one count of aggravated battery, a violation of La.R.S. 14:34(A). After a three-day trial that concluded on February 22, 2018, a unanimous jury found the defendant guilty as charged on both counts. On March 26, 2018, the defendant filed a Motion for New Trial and a Motion for Post Verdict Judgment of Acquittal. Both motions were denied by the trial court on that same date without a hearing.

Subsequently, on March 29, 2018, the trial court sentenced the defendant for attempted second degree murder to fifteen years at hard labor, without benefit of probation, parole, or suspension of sentence, and for aggravated battery to ten years at hard labor, to run concurrently with the sentence imposed for attempted second degree murder. The trial court also ordered the defendant to pay a $5,000.00 fine, court costs, and $75,000.00 in restitution to the victim. On April 11, 2018, the defendant filed a motion to reconsider sentence, which was denied by the trial court on that same date without a hearing. Pursuant to a Motion for Appeal, the defendant is now before this court alleging five assignments of error as to his convictions and sentences.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

## ASSIGNMENTS OF ERROR

1. The evidence introduced at the trial of this case, when viewed under the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) standard, was insufficient to prove, beyond a reasonable doubt, all of the elements of attempted second degree murder. Additionally, the evidence proved that Ross's actions were justified and reasonable under the circumstances.

2. The trial court erred in failing to correctly and sufficiently instruct the jury as to the law necessary for the jury to evaluate the evidence and render a proper verdict in the case, thereby denying Appellant of his right to a fair trial as guaranteed to him by the Constitutions of both the United States and Louisiana.

3. The trial court erred in denying Appellant's Motion for New Trial.

4. Convictions for both attempted second degree murder and the responsive verdict of aggravated battery violate the Double Jeopardy Clause.

5. The sentences imposed by the trial court violate the Eighth Amendment of the Constitution of the United States and the La. Constit. Art. I, § 20, as they are nothing more than cruel and unusual punishment and, thus, excessive. Additionally, the order of restitution was not based upon evidence establishing the actual pecuniary loss.

## SUFFICIENCY OF THE EVIDENCE

The defendant contends the evidence was insufficient to prove all of the elements of attempted second degree murder. The defendant's argument focuses on the lack of evidence that he had specific intent to kill the victim. Additionally, the defendant asserts the evidence proved that his actions were justified under the circumstances. He argues both his convictions for attempted second degree murder and aggravated battery should be reversed.

*Standard of Review*

In *State v. Duplantis*, 13-424, pp. 9-10 (La.App. 3 Cir. 11/27/13), 127 So.3d 143, 148-49, *writ denied*, 14-283 (La. 9/19/14), 148 So.3d 949, this court set forth the standard of review for a sufficiency of the evidence claim:

> The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 [] (2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 [] (1979); *State v. Captville*, 448 So.2d 676, 678 (La.1984)). The *Jackson* standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521 (citing *State v. Robertson*, 96-1048 (La. 10/4/96), 680 So.2d 1165; *State v. Lubrano*, 563 So.2d 847, 850 (La.1990)). The appellate court's function is not to assess the credibility of witnesses or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442.
>
> The factfinder's role is to weigh the credibility of witnesses. *State v. Ryan*, 07-504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. Thus, other than insuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id.* at 1270 (quoting *State v. Lambert*, 97-64, pp. 4-5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726-27). Our supreme court has stated:
>
> > However, an appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall,* 523 So.2d 1305, 1310 (La.1988). In determining the sufficiency of the evidence supporting a conviction, an appellate court must preserve "'the factfinder's role as weigher of the evidence' by reviewing 'all of the evidence . . . in the light most favorable to the prosecution.'" *McDaniel v. Brown,* 558 U.S. 120, 134, 130 S.Ct. 665, 674, 175 L.Ed.2d 582 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). When so viewed by an appellate court, the relevant question is whether, on the evidence presented at trial, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. at

3

> 2789. Applied in cases relying on circumstantial evidence, . . . this fundamental principle of review means that when a jury "reasonably rejects the hypothesis of innocence presented by the defendant[ ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville,* 448 So.2d 676, 680 (La.1984).

*State v. Strother*, 09-2357, pp. 10-11 (La. 10/22/10), 49 So.3d 372, 378.

*State's Evidence*

The first witness to testify for the state was Wildlife and Fisheries Officer James Bruce. On the day in question, Officer Bruce responded to a call regarding a white male shooting at oncoming vehicles. Less than five minutes later, Officer Bruce reached the scene, where he saw a white male lying in the roadway. Several bystanders and a white sedan were parked in the intersection. When Officer Bruce asked about a weapon, he was told a firearm had been given to a Creola Police Officer. Officer Bruce identified several photographs taken of the scene. In one photograph, Officer Bruce identified what he believed was the defendant's vehicle with the back glass shattered and with an apparent bullet hole on the left side of the glass. In another photograph, Officer Bruce noticed fresh tire marks through the median just north of glass located on the ground.

According to Officer Bruce, the defendant was not at the scene when Officer Bruce first arrived but that he approached the officers at some point:

A.     I - - he approached us uh, at that time I did not know who it was approaching uh, but he had approached us from the north uh, from the Bentley direction and he was traveling through the median towards us and he stopped uh, just inside the grass, inside the turn around.

Q.     So when you say he was approaching from the north, was he in the northbound or the southbound lane?

A.     He was in the median.

Q.     Okay, so he wasn't on the roadway?

A.     No, sir.

4

The next witness to testify was Detective Ryan James of the Grant Parish Sheriff's Office. Detective James arrived at the scene about twenty minutes after receiving the call. Someone had drawn a black box where the victim had been located. Detective James was informed by another officer of the following:

> A.     . . . . Mr. Ross's vehicle ran over Mr. Gillette, dragging him out into the roadway where he drew the black box. Went. Stopped. Shots were fired, and then proceeded through the median going north.

Detective James determined the damage to the defendant's back glass was caused by bullets. In a photograph shown by the state, Detective James identified foam that had been knocked out of a headrest by a bullet. According to Detective James, the bullet entered the headrest from the rear and exited it from the front. In another photograph, Detective James identified an area on the glass of the "passenger's side rear" where a bullet entered the vehicle. Detective James identified another bullet hole in the roof of the defendant's vehicle. In the detective's opinion, the bullet hole in the roof was caused by the same bullet that went through the rear headrest and deflected off the driver's headrest.

Detective James also identified photographs taken of the victim while at the hospital. In one photograph, Detective James identified injuries to the victim's leg, and in another photograph, the detective identified injuries the victim suffered from being thrown into the windshield. According to Detective James, the victim's right leg was broken in two places. Detective James testified that the victim was in a lot of pain. Based on statements from witnesses and his interview of the victim, Detective James made the determination to charge the defendant.

When asked on cross-examination if the defendant had a gun in his vehicle, Detective James responded, "Not that I'm aware of." Detective James testified that a knife was recovered from the victim's person. The detective described the knife

5

as having a long shank with a handle and stated that it is primarily used for self-defense. According to Detective James, the firearm used during the incident at issue was carried by the victim. Additionally, the cartridges used in the firearm were designed for self-defense.

The next witness to testify, Byron Thomas, gave a voluntary statement about the incident in question. Mr. Thomas remembered that it was evening when he was traveling south on Highway 167 near Pineville and noticed a Mercedes SUV passing him and slowing down several times. According to Mr. Thomas, the SUV was not aggressive. Mr. Thomas noticed the same SUV pulled over in relation to the incident in question. When asked to describe what he saw regarding the incident in question, Mr. Thomas testified:

> A.    Well uh, I wasn't paying attention to him because he was behind me, but I noticed uh, I guess I had done went around him again . . .
>
> Q.    Okay.
>
> A.    . . . and uh, got ahead of him, but I noticed there was uh, somebody in the - - the faster lane and they we - - I noticed they were slowing down and I guess they were trying to turn, I don't know why they were slowing down, but they had started slowing down, so I did look for the Mercedes and I noticed he was coming up on me very fastly.
>
> Q.    Okay.
>
> A.    Uh, when he got to where he thought he was going to get in front of me, I never changed speeds, like I said I had my cruise control set, and uh, he had to slam on his brakes pretty hard to keep from rear ending this truck because he was trying to get between us but he ran out of slack.
>
> Q.    Okay.
>
> A.    And I did notice - - as soon as I went past the truck that was trying to turn, uh, the Mercedes got behind me very fast, he darted over and then he darted back in front of the uh, the other SUV and come to a screeching halt.
>
>      . . . .

6

Q. Okay, now you said trying to make the turn, uh, did you have a chance to watch that vehicle?

A. Uh, I did not, like I said, uh, we were - - they were slowing down, and everything that I seen past that was kind of in rear view, so I can't be positive about what I seen. Uh, I did watch the S - - the Mercedes change lanes very fastly and then change lanes again very fastly, and the last thing I seen were both vehicles, had both came to a complete stop.

Q. So he changed lanes behind you, is that co - - is that accurate?

A. Yes.

Q. All right.

A. He was in the left lane and when I passed this vehicle, he changed lanes very fast, got behind me and then changed lanes again very fastly, and then he stopped and the, I guess in the middle of the road.

Q. Okay.

A. By this time, they were pretty much in this intersection.

Q. Okay, you described you saw him - - the - - the Mercedes coming up really fast in your rear view - - at the time you noticed the other SUV?

A. Yes, sir.

Q. Um, did - - were they in the same lane when you noticed that?

A. They were in the left lane.

Q. Left lane?

A. Yes, sir.

. . . .

A. . . . but last thing I seen was both the vehicles were completely stopped.

According to Mr. Thomas, the other vehicle was behind the defendant when the defendant came to a complete stop. Mr. Thomas returned to the same area about twenty to thirty minutes later, saw the police, and stopped to offer a statement.

7

On cross-examination, Mr. Thomas explained that the Mercedes stopped in front of the Nissan, forcing the Nissan to stop. On re-direct, Mr. Thomas further explained that his vantage point was through his rearview mirror, but he could tell that the Mercedes had gotten in front of the Nissan. When asked on re-cross if the Nissan had already stopped before the Mercedes got in front of it, Mr. Thomas replied, "I have no idea. That - - that was while I was passing them and that was rear view, I - - I can't tell you what happened right there exactly."

The next witness, Courtney Perrine, was traveling southbound on Highway 167 on the day in question with her mother, who was driving, and Ms. Perrine's boyfriend, Willis White. Ms. Perrine noticed two cars that appeared to be stopped in the median. As Ms. Perrine got closer, she saw one man standing in front of the other vehicle with both arms stretched out. Ms. Perrine described the events that ensued as follows:

> A.    As - - as we were still driving, we got actually directly across to the intersection, and the vehicle the man was standing in front of, um, backed up a little bit and then slammed into drive and ran him over.
>
> Q.    Okay, uh, at the time you could see that, could you - - literally see the man that was standing outside of the vehicle and you - - you said he had his hands uh, outstretched in some way at first, did he appear to be talking to the person in the - - in the vehicle or could you tell?
>
> A.    It - - it appeared that he was.
>
> Q.    Okay, did he appear to be upset that you could tell?
>
> A.    No, no, sir.
>
> Q.    Okay, could you tell uh, were you able to see him clearly from your vantage point?
>
> A.    Uh-huh (affirmative response).

When asked if she noticed anything in the man's outstretched hands, Ms. Perrine replied:

> A.    No, sir, his hands were empty.

8

Q. And - - are you sure of that?

A. I'm positive.

Q. Okay, and - - if he would have anything in his hands, would you have been in a position to see that?

A. Yes, sir.

Q. Okay, can you tell me approximately what kind of distance uh, if - - if you know, from the first time you saw the man with his hands out til the time you saw run [sic] over, what kind of distance are we talking about?

A. Maybe ten (10) yards.

According to Ms. Perrine, the man appeared to be "drug under the vehicle" after he was hit. The vehicle that struck the pedestrian drove forward and immediately stopped. Ms. Perrine then saw the vehicle's "reverse lights kick on" and saw the vehicle back up a "little bit." Ms. Perrine opined that the person driving the vehicle realized that people were stopping and decided to drive forward.

As for gunshots, Ms. Perrine testified that she heard gunshots after she saw the reverse lights come on. According to Ms. Perrine, the man in the vehicle immediately drove forward, cut through the median, drove about a foot on the road, and then veered back into the median and stopped.

When asked if she ever saw the pedestrian try to gain entry into the vehicle, Ms. Perrine responded, "No, sir." Ms. Perrine could see that the pedestrian was armed with a knife in a sheath on his side. Although Ms. Perrine stated she could not see any other weapon on the pedestrian, she stated that she would have been in a position to see a gun in the pedestrian's hands. Ms. Perrine testified again that she did not see any type of firearm in the pedestrian's hands:

Q. Okay, and did you see any type of firearm in his hand?

A. No, sir.

9

Q.    Okay, and I'm talking about, specifically, from the time you saw the man standing outside the car until the time when you - - uh, when the gentlemen drove away, or drove up in the median, you never saw anything in his hands in terms of a firearm or anything in his hands, is that correct?

A.    No, sir.

Ms. Perrine pointed to a person in the courtroom as the driver of the vehicle that ran over the pedestrian.[1] Ms. Perrine explained that when she saw the defendant strike the pedestrian, she yelled at her mother, who then slammed on the brakes. Ms. Perrine was standing on the side of the road calling the sheriff's department when she heard the gunshots.

On cross-examination, Ms. Perrine testified that she was about "a quarter a mile" behind the vehicles when she first saw the incident. When she got a little closer, she saw the pedestrian standing outside the vehicle. Ms. Perrine explained what she saw:

Q.    Okay, and um, the gentlemen, did he appear to be - - he was standing like this?

A.    Um.

Q.    Or like this?

A.    No, he had - - he had both arms stretched to his side, kind of like, what are you doing?

Q.    Okay, and - - did - - did - - did he appear to be excited?

A.    I couldn't tell.

Q.    Okay, could you tell if they were talking or . . .

A.    The man was - - was um, he was speaking towards the man in the vehicle but - -

Q.    Okay, and he had approached the driver's side of the - - the other vehicle?

---

[1]Although the record reflects Ms. Perrine pointed to someone in the courtroom, the record does not state whether that person was the defendant.

A.      No, sir, he was still standing in front of the vehicle.

Q.      In front of the vehicle?

A.      Uh-huh (affirmative response).

Q.      On the driver's side or the passenger's side?

A.      Closer towards the driver's side.

Ms. Perrine acknowledged that she could have missed something when she looked down at the floorboard to get her phone. Finally, Ms. Perrine admitted she said nothing in her written statement about seeing the pedestrian's hands.

On re-direct, the following colloquy took place:

Q.      Okay. If I were to tell you that - - that uh, that - - that Mr. Beck's allegation is, is that at the time the pedestrian was struck with the car, that he had a gun drawn and he was pointing it at the vehicle, were you in a position to clearly see whether or not that was the case?

A.      Yes, sir.

Q.      Okay, did you see uh, a gun drawn at any time, from the time you observed the - - the pedestrian standing outside the vehicle, from the time you stopped and saw him, after he had been run over, and hear the gun shots?

A.      No, sir.

Q.      Okay, and you're sure of that?

A.      Yes, sir.

Ms. Perrine's mother, Tamatha Desadier, testified next for the state. As Ms. Desadier approached the scene, she saw the "younger of the two gentlemen" outside of "the vehicle." According to Ms. Desadier, the younger man had his hands up, and she could tell they were arguing. Ms. Desadier saw the man in the vehicle run over the man standing outside of the vehicle. Ms. Desadier slammed on her brakes, pulled to the side of the road, told her daughter to call 911, jumped out of the vehicle, started to run to the victim to give him aid, and then heard gunshots. Ms. Desadier hollered at a friend (Joey Dubea) to secure the firearm and then went over to help the victim.

11

According to Ms. Desadier, the pedestrian "was more or less rolled over by the car." Ms. Desadier described the pedestrian's position as "by the driver's window."

When asked if she was able to see the pedestrian pretty clearly, Ms. Desadier answered, "Yes, sir." Ms. Desadier stated that she saw the pedestrian's hands and did not see anything in them. When asked if she would have been in a position to see a gun or anything in the pedestrian's hands, Ms. Desadier replied, "Oh, yes, sir." Ms. Desadier did see a knife in a sheath on the pedestrian's side. As for the gunshots, Ms. Desadier could see that they were coming from the victim, who was on the ground and who had just been struck by the vehicle. Ms. Desadier further clarified the sequence of events as follows, "He was struck, and as he was going down, that's when the shots went off." When asked if she knew whether the gunshots hit anything, Ms. Desadier testified:

A. The - - the whole reason I knew he hit something is because when the gentlemen fled the scene . . .

Q. Right.

A. . . . whenever the shots went off, you saw him ditch into the side uh, into the median.

Q. Okay.

A. And I actually sent someone to make sure he wasn't dead.

Q. Okay. Did he come back up to the scene at some point, while you were there?

A. After the police finally arrived. We were on scene for 30 to 45 minutes . . .

Q. Okay.

A. . . . before the police actually got there.

On cross-examination, Ms. Desadier testified that the victim actually hit the defendant's windshield before he rolled off the hood. When asked if the victim acted in a threatening manner, Ms. Desadier answered, "All I saw was the hands up, and -

12

- and the men arguing." Ms. Desadier further testified that the victim had a gun in one sheath and a knife in the other. When asked if she saw the white Mercedes go in reverse after the victim was struck, Ms. Desadier replied, "No."

On re-direct, the state questioned Ms. Desadier about whether the vehicle backed up:

Q.   Ma'am, you had indicated uh, when the gun shots happened, you - - you had not seen uh, the vehicle backing up towards . . .

A.   No, sir, but like I said, I did cowered [sic] down under our vehicle for a second . . .

Q.   Okay.

A.   . . . til the shots - - til the shots stopped, and then I got up.

     . . . .

Q.   Um, so I guess, my - - my question would be, from the time the pedestrian was hit by the car, and that's when you immediately starting [sic] your braking maneuver, is it fair to say your attention[] was probably for - - for a short while, directly towards getting your vehicle stopped, and on the side of the road?

A.   Yes, sir . . . .

On re-cross examination, defense counsel asked Ms. Desadier:

Q.   So when the shots were fired, it looked like Mr. Ross's vehicle was headed a - - way?

A.   Yes, sir.

Benjamin Nettles was taking his daughter to dance on the day in question, when he noticed two vehicles stopped in the "crossover." As he got closer, Mr. Nettles noticed "the first one was standing outside the vehicle and one was still in the vehicle." In Mr. Nettles's opinion, the person standing outside of the vehicle was hunched over with his arms out to his side, looking aggravated and obviously upset about something. When asked if he noticed whether this person had anything in his hands, Mr. Nettles answered, "Uh, I'm pretty sure there was something in his

13

hand, now what it was, I - - I have no idea." The state then asked Mr. Nettles if he would have been able to tell if the item was a firearm, and Mr. Nettles responded, "I don't think so, no, sir, not going at that . . . . that - - that speed . . . ."

According to Mr. Nettles, the pedestrian was standing in front of the other vehicle. Mr. Nettles did not stop since he had his daughter with him. After he passed the intersection, Mr. Nettles looked in his rearview mirror and saw the pedestrian get hit and pushed three or four feet. After his daughter's dance class ended, Mr. Nettles drove back to the same area and saw police. Mr. Nettles stopped and told the police what he saw.

Mr. Nettles testified that he could not tell whether the pedestrian was armed. Then Mr. Nettles testified, ". . . if - - if he was armed, I - - I - - I couldn't - - I didn't notice it." Mr. Nettles did not see anything on the pedestrian's belt or waist.

On cross-examination, Mr. Nettles described the pedestrian's hands as being down when the pedestrian was standing in front of the vehicle. Mr. Nettles reiterated that he believed the pedestrian had an object in his hand but could not tell what it was. On re-direct, Mr. Nettles stated that he was eighty to ninety percent sure the pedestrian had something in his hand.

The victim's wife, Carolyn Gillette, was the next witness to testify. According to Mrs. Gillette, she and her husband (the victim) were about to turn when they noticed a vehicle approaching very quickly from behind. Believing it was unsafe to turn, the victim went across the median and pulled over. The vehicle, a white Mercedes, passed and then came back. According to Mrs. Gillette, the Mercedes returned by putting his vehicle in reverse. Mrs. Gillette testified that the person in the Mercedes backed up directly next to her on the passenger's side:

Q. Okay. And - - and what happened at that point when he got window to window?

14

A.   He was screaming and hollering that we didn't know how to drive, and driving to [sic] slowly in the left hand lane, just being, I mean, just ironic, just angry, he was mad, you know, and - - and I kind of got scared a little bit because I wasn't for sure what he was going to do, he was right there, you know, and uh, that's when Billy stepped out of the car.

Mrs. Gillette testified that the defendant was yelling obscenities and was very upset with them.

According to Mrs. Gillette, the victim was not "really upset" with the defendant but was confused as to why the defendant was so upset. Mrs. Gillette testified that the victim got out of the car when she said the defendant was scaring her. The victim walked to the back of the car the victim was driving, and the defendant backed up. Mrs. Gillette could hear what was being said and could see what was happening through her rear-view mirror. Mrs. Gillette described the ensuing events as follows:

Q.   Okay. Do you recall any of the - - the verbal exchange, were you able to hear the conversation?

A.   Well, uh, he was telling Billy again, no, no, that - - that lane is - - is 65 and, you know, he was going 40 and - - and that was crazy, and he was - - he was ranting and raving, the same stuff over and over, the - - the foul words, and Billy just told him, he said man, none of this is worth this, just - - just go on. Just go on home, go on about your business, you know, and he again- - he - - you're here threatening me, Billy is like what? No, I'm not threatening you.

Q.   Okay.

A.   You know, he says, well you're packing a gun, he said so.

Mrs. Gillette described the victim's voice as raised when the victim told the defendant to leave. According to Mrs. Gillette, the defendant could have simply pulled forward to leave.

Mrs. Gillette testified that she never saw the victim try to get in the defendant's car, make a step toward the defendant's car, or threaten the defendant. Mrs. Gillette did, however, hear the defendant threaten the victim by stating, "I will

15

kill you if you threaten me." When asked if the victim was armed, Mrs. Gillette replied the victim always open carried a .357 Revolver. Mrs. Gillette testified that during the time the victim was out of the vehicle, she never saw a weapon in his hand. According to Mrs. Gillette, the victim had a gun that was holstered, the victim had one hand hanging, and the victim had one hand pointing north when the victim spoke to the defendant. When asked what happened next, Mrs. Gillette testified:

> A. Well, all of sudden, I mean, just, I never - - I - - Billy told him to leave and Mr. Ross, I could see through my side mirror, was backing up, I - - I assumed, maybe he was getting our license plate number for whatever reason, he wanted it, I don't know, but, there was no reason for him to back up.
>
> Q. Okay.
>
> A. And when I realized why he was backing up, it was like, - - it was too late.
>
> Q. Okay.
>
> A. Billy tried to get out of the way but, he couldn't get out of the way fast enough, and then Billy just disappeared on me.
>
> Q. Okay.
>
> A. Just completely out of my view.
>
> . . . .
>
> A. . . . And I thought he was under the car, I didn't know that he was being drug on the other side of the car.
>
> Q. Okay.
>
> A. Um, I thought that he was under the car, and I kept looking for him to come out from underneath the car, and then the - - the next thing I saw was, Billy was laying across the media [sic] on the other side of the highway, in the uh, little white ring thing right there.
>
> Q. Okay.
>
> A. And he was laying there, he wasn't moving, and it was uh, almost - - it was just like a tunnel vision for me, all I can do was see him laying there, and then I heard the guns go off - - the gun go off, and it was just like - - it - - it woke me up, and he was alive.

16

. . . .

Q.     Okay, did - - did you notice him drawing the gun or does - - is that something you - - he described to you, . . .

A.     No, . . .

Q.     . . . . since then?

A.     . . . I - - I didn't - - I didn't see it, . . .

Q.     Okay.

A.     . . . I'm - - even though I was looking straight at him, it was just like - - it took that gun shot to - - to . . .

Q.     Okay.

A.     . . . pull me out of that um, - - all I could - - all I was imaging was, he - - he was gone.

When asked what she did after she heard the gunshots, Mrs. Gillette replied that she got out of the car, and the defendant was speeding off down the median. Mrs. Gillette estimated the defendant traveled about fifty to sixty yards before stopping. Describing the victim's injuries, Mrs. Gillette stated:

A.     I knew right off the bat, that he had a concussion, he had a huge knot on his head, some uh, lacerations on both arms, uh, his clothes were just all drug to pieces, and his foot, his leg was tangled, just it - - it was - - you could tell it was broken.

At the conclusion of her direct examination, Mrs. Gillette testified that even though the victim did not threaten the defendant, she assumed the defendant saw the victim's holstered gun as a threat. Mrs. Gillette reiterated that the victim's gun remained holstered the entire time.

On cross-examination, Mrs. Gillette explained that the victim did not go into the turning lane to turn but remained in the left lane. When the victim saw the defendant's car quickly approaching, the victim tapped on his brakes to let the defendant know to pull over. The victim pulled over, and the defendant continued to travel a couple of car lengths before he backed up to the passenger's side of the

17

victim's car. When the victim got out to speak to the defendant, the defendant backed up his car to speak to the victim. According to Mrs. Gillette, the victim and the defendant were communicating right behind the victim's car. On re-direct examination, Mrs. Gillette reiterated that just before he was struck by the defendant's car, the victim had no gun in his hand.

The final witness to testify for the state was the victim, Billy Gillette. The victim testified that on the day in question, his wife picked him up from work, they stopped to get "a six pack," and they were approaching an intersection to make a turn to go home when he noticed a vehicle approaching him "very fast." Instead of trying to make the turn, the victim got off the road and stopped. The victim described the vehicle approaching him as a silver or white Mercedes Benz SUV. The Mercedes passed the victim and then backed up to confront the victim. When asked what happened next, the victim testified:

> A. He was raising all kind of cain, fussing at us, uh, I heard him say, I'll kill you, you SOB, dah, dah, dah, you don't need to be f-ing driving, this, that, and another. At that point, that's when I realized, I'm sitting here, my wife is between me and him.
>
> Q. Okay.
>
> A. All right? The only reason I got out of the vehicle was to get his - - his attention off her, I moved around back here.
>
> Q. Okay, did he stay beside the vehicle?
>
> A. No, sir, no. Soon as I came around here, he backed up.
>
> . . . .
>
> A. Yes, sir, but - - but when uh, when I got out of my car to go around the back, he apparently saw me because he - - he - - he backed up right here, and that's where we had our confrontation.

The victim stated that he felt his wife was threatened and had no idea what the defendant was capable of. The victim stated that he did not know whether the

18

defendant was armed and heard the words, "I'll kill you." The victim continued

testifying as to the incident as follows:

> Q. All right, and so after you got out of the vehicle, and he backed up to where you last indicated his car was, uh, where did you go - - what - - how - - how - - where did you go from there?

> A. I got out of my vehicle, because he was still here, I got out of my vehicle and started walking this way, around the back, like I said getting his attention away from my wife, get her out of danger. He backed up at the same time and stopped right here, and I was probably six (6) feet from his vehicle.

> Q. Okay, and he had his window down, I'm assuming?

> A. Yes, he did.

> Q. Uh, in relation to the front of the side uh, where - - where in relation did his vehicle did you - - did you end up?

> A. I ended up about six (6) feet away from - - five (5) or six (6) feet away from his window, . . .

> Q. Okay.

> A. . . . facing him.

> Q. All right, so as you did that um, did you - - did you have any more words?

> A. Oh, yes, we had a few words.

> Q. Okay.

> A. Uh, about you - - uh, I didn't need to have a driver's license, uh, I was f–ing crazy, how uh, uh, you - - 65 here, uh, I tried to explain to the man that I'm making a turn here to go home, he had no - - he don't want to hear it, . . .

> Q. Right.

> A. . . . you know, and yeah, we - - we had a few uh, cuss words at each other, and I just - - I finally said, it's not worth all this, leave, and I pointed in that direction.

> Q. Okay.

> A. With my right hand, I said just leave, just go. He looked at me and as he shook his head like he agreed, okay, I said okay, this is over

19

with. I began to back away from the vehicle, the whole time the gun was in the holster on my left side, . . .

Q.  Right.

A.  . . . I cross carry.

Q.  Right.

A.  All right? I'm backing up but I'm not - - I'm not turn [sic] my back on him, he proceeds to back up about thirty (30) feet, right in this area somewhere, I'm about right where this square is at the time. My door on my vehicle is open, all right? I'm heading back this way, I think he's either backing up to get my license plate number because he can't see it or he's leaving the scene.

Q.  Okay.

A.  Uh, he straightened his vehicle up like so, and before I knew it, he gassed it, hit me, I hit the front driver's side, as I recall, front driver's side, broke my leg, I hit the windshield, concussion. When I stopped rolling, I was right here.

Q.  Okay.

A.  So, I mean, he - - he dragged me - - he drug me, thirty (30) feet, whatever. When I got through rolling, I was right here on the side of the road. I went - - I kind of went out just for a couple of seconds, it was black, - - all I saw was sky, road, sky, road, sky road, then I remember me - - my leg hurting, and feeling pain in my head.

Q.  All right, where . . .

A.  I was wearing a - - I was wearing a cap and sunglasses, and the glo - - the sun glasses got destroyed. But uh, I was laying here, my head was this way, I was facing that way, looking at direction, laying on my side, on my right side like so. When I looked at Mr. Ross's vehicle, I saw taillights, and then I saw the white reverse lights, . . .

Q.  Yes, sir.

A.  . . . and at that point, I said the man is trying - - he's making me good on his threat, he's going to try to back over me. He did the back up, and that's when I unholstered my weapon, and I fired three (3) shots in the back of his vehicle to change his mind, and he did. He then proceeded up in this way, he went down the road, it seemed a little bit further, he stopped right about up here.

Q.  Okay, right.

20

A.     And then - - then aft - - after - - that I was watching him because I thought he was going to be coming back, and all I could think of was, you know, I'm about to die, I'm about to die here, and uh, everything started going fuzzy after that, and the next thing I know, there's a first responder next to me telling me not to go to sleep, rolled me on my back, . . .

Q.     Okay.

A.     . . . you know, but uh, in that time period, I'll tell you this, in that time period when I was laying there, I was thinking to myself, nobody is going to come and help me if I have a pistol in my hand, so I reholstered my pistol, and threw it over in the grass.

According to the victim, the defendant threatened to kill him when the victim was standing outside of the vehicle talking to the defendant. The victim reiterated that he never threatened to hurt the defendant and never drew his firearm. When asked how he knew this vehicle dragged him, the victim stated that he was relying on the police report, the fact that he ended up about thirty feet from where first hit him, and the fact that he had abrasions on his arm.

When shown photograph numbered S-2, the victim identified the broken windshield of the defendant's car. The victim testified that he saw the glass shatter when the round hit. According to the victim, the glass fell out when the defendant's car was coming toward him. When asked if he could tell how fast the vehicle was traveling toward him, the victim testified, "Uh, all I knew, he was coming back." The victim further testified that the reverse lights indicated the vehicle was coming back.

As for the injuries, the victim testified:

A.     My right leg uh, had the fibula, the small bone broke in two (2) places. Uh, there's also a - - a fracture of the ankle. Abrasions and cuts to my knees and what have you. Uh, the left leg just had some abrasions and cuts, see that's, you know, my right leg there.

Q.     This is your right leg here?

A.     Yes, sir.

21

Q.     Can you tell me a little bit about what they had to do to repair your uh, your leg?

A.     Yes, sir, it required surgery, they had to put a titanium rod, a plate, and six (6) to eight (8) screws, I'm not sure exactly the number, in my right leg, uh, and now I'm - - I'm packing this metal - - plus I've got a scar about ten (10) or eleven (11) inches long on my leg.

The victim testified that his recovery was about eight weeks, and his leg bothers him every morning.

Finally, the state asked the victim if he ever pulled his weapon out of his holster, and the following colloquy ensued:

A.     Sir, that never - - the weapon never left my holster until Mr. Ross had run me down, . . .

Q.     Okay.

A.     . . . and in my mind, was attempted [sic] to do it again, that's when I holster - - that gun was unholstered, used and then secured after he - - he had left the area supposedly.

Q.     Okay, um, you described for me the - - the event after you got struck by the car, and how far you traveled uh, and I'm assuming that was a very traumatic uh [sic], wasn't it?

A.     Yes, sir.

Q.     Um, would you have been able to hold on to that pistol if you had put it in your hand?

A.     No, sir, I don't see how I could have.

Q.     Okay.

       . . . .

A.     I'm not saying it's impossible, but I can't see it.

When asked if he recognized the person who ran over him as someone in the courtroom, the victim replied, "That gentlemen [sic] right there."

On cross-examination, the victim agreed that he was armed with a .357 Magnum and a knife when he exited his vehicle.  The victim described the knife as a four-inch fixed blade used for cleaning his fingernails, cutting strap ties, and

22

opening packages. The victim also agreed that the knife is sharp on both sides and could be used to stab someone, although it is not designed for that purpose. When asked if he normally carried his gun on his person, the victim replied, "Yes, sir, all the time."

When asked if it was fair to say he was mad when he exited his vehicle, the victim replied, "I was upset, yes, I was." The victim agreed that it was an animated argument with cursing. When defense counsel asked him if he put his hands on his weapon at any time, the victim replied, "Never." According to the victim, the defendant hit him with the front driver's side of his vehicle. The victim was standing "no closer than six (6) feet" from the driver's side of the defendant's car and never touched the defendant's car. After being hit, the victim was disoriented for a few seconds. Defense counsel asked the victim how soon he fired his weapon after "waking up," and the victim replied:

> A.    It's hard to say uh, I was laying on the side, kind of realized what was happening and I looked down, and I saw Mr. Ross's vehicle, brake lights and reverse lights on. I - - I'm going to say probably three (3) seconds, five (5) at the most, . . .
>
> . . . .
>
> Q.    And then you starting [sic] firing at the vehicle?
>
> A.    That's when I pulled my weapon and began fire, yes.

On re-direct, the state asked the victim why he did not shoot the front of the vehicle when the defendant first hit him, and the victim replied, "Because my weapon was still holstered on my right hand . . . . on my left-hand side." When asked if he had time to get his weapon out, the victim replied, "No way."

*Defendant's Testimony*

The defendant testified on his own behalf. On the day in question, the defendant received a shot for his back at Rapides General and was going to pick up

23

a prescription when he was driving north on Highway 167. Defense counsel asked the defendant when he first saw the victim, and the following colloquy took place:

A.     Uh, whenever I run up behind him, . . .

Q.     Okay.

A.     . . . I got into uh, 55 mile per hour zone, just north of Creola, which is about probably half a mile from the store to where all this here was at.  When I hit 165, I come - - I mean, uh, 65 . . .

Q.     167 you mean?

A.     . . . I mean, yeah, 167, I sped up to 65 or maybe a little over, . . .

Q.     Uh-huh (affirmative response).

A.     . . . and uh, I passing an 18-wheeler on the right-hand side, and uh, when I got - - I got probably - - I don't know, probably about down here at the bottom of this picture down here, and I run up behind him, and uh, he was going pretty slow that day, . . .

Q.     Okay.

A.     . . . on the highway.

Q.     What you do then?

A.     Uh, when I couldn't get over, I went around the truck so I had - - I had to hit my brakes.

Q.     Okay, and aft - - after you hit your brakes, what happened?

A.     Uh, about got run over by another truck behind me . . .

Q.     Okay.

A.     . . . uh, but uh, I started slowing down and uh, Mr. Gillette was hitting his brakes all the way through here several times just, you know, hitting his brakes, looking back in his mirror at me, I could see him in the mirror because I was close to him.  When the 18-wheeler passed me, I was going to get over and go around him . . .

Q.     Uh-huh (affirmative response).

A.     . . . but the green truck behind me, that almost hit me, he - - he shot around me, and when he did it was a tan car almost run into the back of me, too.

Q.     Okay.

24

A.    That I - - I - - I had . . .

Q.    Y'all were - - y'all - - y'all were almost at a stop at this point?

A.    Oh, yes, sir, yes, sir, uh - -

Q.    And - - and y'all were . . .

A.    (Indistinct).

Q.    . . . y'all were in the lefthand lane on 167?

A.    We were up in here, there was a tan car coming around me because I - - I was watching it, trying - - trying to keep distance between running into him and keep the other car from hitting me, and it passed me about right in here.

Q.    Okay.

A.    And by then, I mean, Mr. Gillette was about stopped, and he come up there and turned in right here, right - - right - - at an angle, right in here.

Q.    Okay, now did Mr. Gillette ever use that turning lane at any time?

A.    No, sir, never once got in it.

Q.    Okay.

A.    And didn't ever have his blinker on either.

According to the defendant, he backed up because the victim and his wife were looking at him. The defendant testified that when he stopped in the median, the victim exited his vehicle with a pistol in his hand and walked up to the defendant's car door. The defendant further testified that his car was still in reverse when the victim walked up to it. When asked if he had a chance to say anything to the victim, the defendant answered:

A.    No, sir, I didn't.

Q.    Okay.

A.    I couldn't say nothing.

Q.    Did he say anything to you?

25

A.    Yeah, he told me he was going to kill me, I don't know what I was doing, he - - I wasn't saying nothing, I - - I didn't want to move. I mean, I'm sitting there looking at a barrel - - like this, and uh, I couldn't move, he had both hands on his gun, with his hand out on me like that.

Q.    What did his face look like?

A.    He was red faced, uh, he was sweating.

Q.    Uh-huh (affirmative response).

A.    He was uh, he was upset. I was looking dead in his eyes, I was looking down at that barrel, . . .

        . . . .

A.    He told me he was going to blow my mother f–ing brains out.

The defendant testified that he backed up enough to where he could turn and hit the victim to get away from him, then put his car in drive, and ducked so the car would take the bullets. The defendant then testified:

A.    And uh, I gassed it, and laid down, and I turned the wheel to hit him, and when I hit him, he come up on the car.

Q.    Uh-huh (affirmative response).

A.    I drove across the median, he was up on the car, and a woman hollered, there goes the windshield. I made a hard right, laying in the seat, I made a hard right, he fell off the car, right in here.

Q.    Uh-huh (affirmative response).

A.    And I turned and went down the median, well when I - - when he rolled off, I stopped just for a second, raised up and looked at him, he was laying on his chest and his belly, laying down, his head was looking back toward the road.

Q.    Okay, and - - and - - and why - - why did you look at him?

A.    I wanted to see if he was all right, I didn't - - I didn't want to hurt the man, I was trying to get away from the gun, and uh, when I took off, I run over his back leg, I mean, his legs with my back tire on the car - - I felt it boom, boom, when I run over him.

Q.    Uh-huh (affirmative response). And when - - when did you start getting shots fired at you?

26

> A.    As soon as I left the road, as soon as I left right here - - because I turn and went - - I turned and went down the shoulder of the road all the way - - I went a pretty good ways down there, because he was shooting.  I looked in my mirror, I was laying down, I looked in my mirror, he was sitting up in the road shooting at me.
>
> Q.    Uh-huh (affirmative response).
>
> A.    He had both hands on his gun.

The defendant waited with his vehicle until the police arrived.

When asked if he meant to kill the victim when he hit him, the defendant responded, "Lord no, I wasn't trying to hurt nobody."  When asked if he carried a weapon in his car, the defendant testified that he carried a machete on the floorboard in case he needed to chop bushes so he could use the bathroom in the woods.

On cross-examination, the state asked the defendant if he backed up to tell the victim how to drive.  The defendant answered, "No, sir, I backed up - - I backed up to tell him that there's a turning lane right here, and that's what it's for in that 65 miles an hour zone . . ."  The defendant denied telling Officer Ryan James that he backed up to give the victim a piece of his mind.  The defendant also denied telling Mrs. Gillette anything when he backed up to her window.  The defendant also stated that Mrs. Gillette got out of the car.  Although the victim never attempted to get in his car, the defendant testified that the victim had a gun on him and stated that he was going to kill the defendant.

The state and the defendant then had the following colloquy about the defendant's ability to move while the victim allegedly had a gun pointed at him:

> Q.    Right, and so, my point is, when you said you couldn't move because you had a gun at your head - - a foot from your face, you moved at least twice after that.  You went into reverse, you backed up your car.  You pointed your car at him, and then you shifted gears, . . .
>
> A.    Uh-huh (affirmative response).
>
> Q.    . . . you said you undid your seatbelt, . . .

A. Uh-huh (affirmative response).

Q. . . . and then you floored it.

A. I laid it down, I laid it down and punched it.

Q. And then ran over him.

A. I hit him with my car.

Q. Okay. So my - - my point is, you could move?

A. Yeah, to get him - - to get him out of my way, yeah.

Q. Okay.

A. To get the gun out, yeah.

Q. And are - - I guess, what would have been the difference between doing that and - - and driving down the road?

A. Pulling out in front of traffic.

Q. So there was traffic coming?

A. Well it could have been, I couldn't look.

The defendant admitted he committed an aggravated battery against the victim but claimed it was committed in self-defense. After the defendant hit the victim initially, the defendant stopped to make sure the victim was okay, and then took off without knowing the victim's legs were still under his car.

*State's Rebuttal Witness*

The state called Detective Ryan James on rebuttal. According to Detective James, when he spoke with the defendant at the scene, the defendant said he backed up to give the victim a piece of his mind. The defendant also told Detective James that the victim had his gun drawn and that the defendant would have gotten shot if he had not taken action. According to Detective James, the defendant did not tell him that the victim threatened to shoot him. Detective James recounted that the

28

defendant told him he ran over the victim because he was afraid the victim was going to kill him.

*Argument*

The defendant argues the evidence was insufficient to prove he had the specific intent to kill the victim and argues his actions were justified. The defendant cites the testimony of Byron Thomas, the witness who saw the defendant making his way through traffic before the incident in a non-aggressive manner. The defendant also cites Mr. Nettles's testimony that he saw something in the victim's hand and Ms. Desadier's testimony that shots were fired as the victim was going down. The defendant claims both of these testimonies support his testimony that the victim was armed before the defendant ran him over. Additionally, the victim and his wife both admitted the victim was carrying a firearm and a knife, and the victim's wife assumed the defendant was threatened by the weapons the victim was carrying. The defendant argues that even if the victim did not take his gun out of the holster, the defendant was still reasonable in fearing for his safety as he was approached by a man armed with a firearm. Furthermore, since the victim approached the defendant, the defendant argues the victim was the aggressor. The defendant claimed he argues these facts prove his actions were justified for both offenses and, at the very least, prove he did not have specific intent to kill the victim.

The state argues the evidence was sufficient to prove the defendant specifically intended to kill the victim. The state refers to the fact that the victim testified the defendant backed up his vehicle so that he could run over the victim rather than simply leave the scene. Even the defendant's own testimony supports the fact that he accelerated rapidly toward the victim. Furthermore, both the victim and Ms. Perrine testified that the defendant began backing up after he hit the victim the first time. These facts, the state argues, indicate the defendant's desire to run

29

over the victim again. The only reason the defendant did not run over the victim again, the state argues, was because the victim fired shots at the defendant's vehicle. Considering the above evidence, along with the fact that both the victim and the victim's wife testified the defendant threatened to kill the victim, the state contends the evidence was sufficient for a rational juror to infer the defendant specifically intended to kill the victim.

As for the lack of evidence that the defendant's actions were justified, the state argues:

> Defendant's Counsel in brief also suggest that Mr. Ross' actions were justified and reasonable. This suggestion is just not accurate given the testimony of the witnesses in the case. No other witness testified that the victim threatened the defendant by un-holstering the firearm prior to Mr. Ross deciding to run the victim over. The physical evidence at the scene also corroborates the testimony of each of the witnesses (except that of the defendant). The bullet holes in Mr. Ross' car are all in the rear of his Mercedes. If the victim had been threatening Mr. Ross with his drawn sidearm, the bullet holes would have much more likely to have been found in the front or driver window of the defendant's Mercedes, instead of the defendant's back windshield. Additionally, if the victim had his gun drawn, threatening the defendant as he testified, it would have been nearly impossible for the victim to have maintained possession of the firearm while being run down and dragged by the defendant's vehicle. The only reason the victim was able to maintain possession and control of the weapon was because it was in his holster as the other witnesses testified. Mr. Ross was clearly the aggressor during this incident of road rage. Although he could have driven on past after running the victim off the road, he chose to block the victim's vehicle then back up to aggressively confront the victim. He then decided to run over the victim with his Mercedes, instead of going on down the highway. Evidence of specific intent was plentiful, and the defendant's actions were in no way justified.

### *Discussion*

This court has stated the following regarding the proof of specific intent for attempted second degree murder:

> With regard to the defendant's convictions for attempted second degree murder, La.R.S. 14:30.1 provides, in relevant part, that "[s]econd degree murder is the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm[.]" Further, attempt is defined in La.R.S. 14:27(A), which provides that:

Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

Thus, although La.R.S. 14:30.1 provides that second degree murder requires "specific intent to kill" *or* "to inflict great bodily harm," in order to be convicted of attempted second degree murder, the State must prove that the defendant had the specific intent to kill. *State* [*v.*] *Thomas*, 10–269 (La.App. 3 Cir. 10/6/10), 48 So.3d 1210, *writ denied*, 10–2527 (La. 4/1/11), 60 So.3d 1248, *cert. denied*, 565 U.S. 859, 132 S.Ct. 196, 181 L.Ed.2d 102 (2011). However, that intent may be inferred from the specific circumstances of the offense and the defendant's conduct. *Id.*

*State v. Richardson*, 16-107, p. 6 (La.App. 3 Cir. 12/28/16), 210 So.3d 340, 347.

Considering the specific circumstances of the present offense and the defendant's conduct, the jury reasonably inferred the defendant specifically intended to kill the victim. The jury obviously did not find the defendant's version of the events credible but, instead, believed the testimony of the state's witnesses. Considering the evidence in a light most favorable to the state, the evidence supports a finding that the defendant purposefully pulled his car next to the victim's car to confront the victim about his driving, threatened to kill the victim, purposefully positioned his car to be able to hit the victim, accelerated the vehicle toward the victim, hit the victim, dragged the victim several feet, and attempted to back up and run over the victim again before the victim began shooting. These facts support the jury's finding of specific intent.

As for the defendant's claim of justification, the jurisprudence states the following:

A different justification provision applies to Defendant's self-defense claims for the two attempted second - degree murder convictions:

A. The use of force or violence upon the person of another is justifiable when committed for the purpose of preventing a forcible offense against the person . . . provided that the force or violence used must be reasonable and apparently necessary to prevent such offense

. . . .

La.R.S. 14:19. "In non-homicide cases, . . . the defendant [has] the burden of proving self-defense by a preponderance of the evidence. The issue of self-defense requires a dual inquiry: (1) an objective inquiry into whether the force used was reasonable . . . ; [and] (2) a subjective inquiry into whether the force was apparently necessary." *Hall,* 606 So.2d at 973–74 (citations omitted).

*State v. Williams*, 10-900, p. 4 (La.App. 3 Cir. 3/9/11) (unpublished opinion), *writ denied*, 11-1060 (La. 12/2/11), 76 So.3d 1173.

As stated earlier, it is apparent that the jury in the present case did not believe the defendant's testimony. Considering the evidence in a light most favorable to the state, the evidence shows the defendant intentionally confronted the victim about his driving, yelled obscenities at him, and threatened to kill him. The victim approached the defendant carrying a gun on his side, but not holding the gun in his hand, and told the defendant to leave the scene. Instead of simply leaving the scene, the defendant accelerated forward and intentionally ran over the victim with his car. Even if the defendant felt threatened by the holstered gun, the defendant's choice to run over the victim instead of leaving the scene was not reasonable. Under these circumstances, the jury rationally determined the force used by the defendant was neither reasonable nor necessary under the circumstances.

This assignment lacks merit.

**BURDEN OF PROOF**

The defendant contends the trial court improperly instructed the jury that the defendant bore the burden of proof as to his justification defense. Although the defendant acknowledges that this court as well as other courts have placed the burden of proving justification on the defendant in a non-homicide case, the defendant

32

contends these cases are not well-reasoned and should be revisited. The defendant cites *State v. Baker*, 06-2175 (La. 10/16/17), 970 So.2d 948, *cert. denied*, 555 U.S. 830, 129 S.Ct. 39 (2008), a supreme court case that revisited well-settled law involving an unrelated issue for the proposition that there are times when such "revisitation" is appropriate. The defendant concludes this assignment by requesting this court do the following:

> Appellant requests this court to re-examine its earlier decisions addressing the issue of who bore the burden of proof in non-homicide cases, which did not include lucubration of the issue, and find that the burden was indeed the State's to bear. The convictions and sentences should be set aside and a new trial ordered.

In brief, the state notes trial counsel objected to the following jury instruction in this case:

> Defendant has argued that he acted in self-defense. To establish such a defense in a non-homicide case, the defendant has the burden of proving by a preponderance of the evidence that the use of force was justified.

Trial counsel noted his objection because there was a split in the circuits. The trial court issued the following ruling:

> BY THE COURT:      Counsel, the issue of uh, self defense was recently addressed in a case called **State versus [Barron]**, 51[,]491 it was a Second Circuit Court of Appeal case, August 9th, of 2017. In that case, the court spent some time talking about the um, burden of proof in a non-homicide case. That, the Second Circuit noted that there is a split but, indicated that the Second Circuit, Third and Fifth have consistently held that the defend [sic] has the burden of proving by the preponderance of the evidence, the defense uh, self defense or justification, the Court intends to follow that line of reason. So the objection to the jury charge is overruled.

In brief, the state cites a case by this court, *State v. Jasper*, 11-488 (La.App. 3 Cir. 11/2/11), 75 So.3d 984, where this court affirmed the placing of such burden on the defendant in a non-homicide case. The state asserts the defendant is attempting to convince this court to overturn years of well-reasoned prior court decisions. The state notes there has been no supreme court ruling or statutory mandate compelling

such a change. Finally, the state asserts that even if this court decides to change the law, a harmless-error analysis should be applied since there was no credible evidence of self-defense presented.

*Discussion*

The second circuit case cited by the trial court set forth a good summary of the history and current state of the law regarding the burden of proving self-defense in a non-homicide case:

> Self-defense in a *homicide* case is governed by La. R.S. 14:20. Self-defense in a *non-homicide* case, such as the present matter, is governed by a separate statute, La. R.S. 14:19, set forth above. In Louisiana, the burden of proving self-defense in a non-homicide case has been the matter of some discussion. In *State v. Freeman*, 427 So.2d 1161 (La. 1983), the Louisiana Supreme Court noted that different statutory standards exist to justify the use of force or violence under La. R.S. 14:19 and 20, depending on whether a homicide results. In a non-homicide case, a claim of self-defense requires a dual inquiry: first, an objective inquiry into whether the force used was reasonable under the circumstances; and, second, a subjective inquiry into whether the force used was apparently necessary. The court in *Freeman* observed that the burden of persuasion in proving self-defense in a non-homicide situation, which entails a subjective as well as an objective inquiry, could arguably be on the defendant since a subjective inquiry is involved. However, in disposing of the issues before it, the court in *Freeman* found it unnecessary to decide definitively whether the state or the defendant had the burden of proof in a non-homicide case.
>
> In *State v. Cheatwood*, 458 So.2d 907 (La. 1984), the Louisiana Supreme Court recognized that our statutory criminal law does not directly address the burden of proof for "defenses." The court found there was a logical distinction between defenses which actually defeat an essential element of the offense, such as intoxication or mistake of fact, which preclude the presence of the mental element of the offense, and those defenses which present exculpatory circumstances that defeat culpability despite the state's proof beyond a reasonable doubt of all of the essential elements. In *Cheatwood*, the court observed that defenses such as justification are truly "affirmative" defenses because they do not negate any element of the offense, and it is logical to conclude that the legislature intended the defendant to prove by a preponderance of the evidence the exculpatory circumstances constituting the affirmative defense.
>
> This circuit has repeatedly held that the burden of proving self-defense in a non-homicide case rests with the defendant to prove the defense by a preponderance of the evidence. *See State v. Williams,*

*supra; State v. Jones*, 49,396 (La. App. 2 Cir. 11/19/14), 152 So.3d 235, *writ denied*, 2014-2631 (La. 9/25/15), 178 So.3d 565; *State v. Glover, supra; State v. Cheatham*, 38,413 (La. App. 2 Cir. 6/23/04), 877 So.2d 164, *writ denied*, 2004-2224 (La. 6/24/05), 904 So.2d 717; *State v. Robinson, supra; State v. Mason*, 499 So.2d 551 (La. App. 2 Cir. 1986).

*State v. Barron*, 51,491, pp. 13-15 (La.App. 2 Cir. 8/9/17), 243 So.3d 1178, 1185-86, *writ denied*, 17-1529 (La. 6/1/18), 243 So.3d 1063. The third and fifth circuits also appear to follow the same rule as the second circuit, while the fourth circuit has issued conflicting decisions about where the burden of proof lies. *Id.*

Until the Louisiana Supreme Court addresses and resolves the split in the decisions of the appellate court on this issue, we will follow our own well-settled jurisprudence and continue to place the burden of proving justification on the defendant in a non-homicide case. Additionally, this court has held that even when an improper burden of proof may have been imposed on the defendant, courts have been willing to uphold the conviction when the record supported a finding that the defendant did not act in self-defense. *See State v. Heider*, 12-52 (La.App. 3 Cir. 10/3/12), 101 So.3d 1025. As discussed in the previous assignment of error, the record in the present case supports a finding that the defendant did not act in self-defense.

This assignment lacks merit.

## MOTION FOR NEW TRIAL

The defendant asserts the trial court erred in denying his Motion for New Trial. On March 26, 2018, the defendant filed a Motion for New Trial. The motion asserted the following grounds:

1.

The trial court erred in refusing to include the Defense tendered jury instruction stating that it is the State's burden to prove that the defendant's conduct was not justified.

2.

35

The verdict is contrary to the law and the evidence. The ends of justice would be served by granting the defendant a new trial.

The trial court denied the Motion for New Trial by a written ruling, which stated, "Denied. Objection to jury instruction was addressed during the trial." Based on the arguments set forth in support of the preceding assignment of error, the defendant contends the trial court erred in denying his first ground for a motion for new trial (jury instruction on burden of proof in non-homicide self-defense). As we discussed in that assignment of error, we find the trial court did not err in instructing the jury. Thus, the trial court did not err in denying the motion for new trial reasserting the same issue. As for the verdict being contrary to the law and evidence and the ends of justice being served by the granting of a new trial, the defendant contends the trial court erroneously concluded the evidence was sufficient to sustain both convictions. As discussed in the first assignment of error, we find the evidence was sufficient to sustain both convictions.

This assignment lacks merit.

## DOUBLE JEOPARDY

In this assignment of error, the defendant argues his protection against double jeopardy was violated by being convicted of both attempted second degree murder and aggravated battery.

It is unconstitutional to place a person twice in jeopardy of life or limb for the same offense. United States Constitution Amendment V. The Double Jeopardy Clause was made applicable to the states through the Fourteenth Amendment, and Article 1, Section 15 of the 1974 Louisiana Constitution contains a similar guarantee. The guarantee against double jeopardy provides three central constitutional protections: (1) it protects a defendant against a second prosecution for the same offense after acquittal; (2) it protects the defendant against a second prosecution for

36

the same offense after conviction; and, (3) it protects the defendant against multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072 (1969).

In reviewing double jeopardy claims, Louisiana courts are to apply the standard established by the Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180 (1932). *See State v. Frank*, 16-1160 (La. 10/18/17), 234 So.3d 27. "Under the [*Blockburger*] test, there is no double jeopardy ... where each provision requires proof of an additional distinct element that the other does not." *State v. Cooley*, 11-959, p. 12 (La.App. 3 Cir. 4/4/12), 87 So.3d 285, 295, *writ denied*, 12-1008 (La.10/26/12), 99 So.3d 640.

In the matter before us, the defendant was charged and convicted of the offenses of attempted second degree murder and aggravated battery, both charges arising from the same transaction.

Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. "Attempt" is defined in La.R.S. 14:27 which states, "Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended[.]" As previously noted, in order to prove attempted second degree murder the state must prove beyond a reasonable doubt that there was a specific intent to kill the victim.

Therefore, in order for the defendant to be convicted of attempted second degree murder, the state had to prove that the defendant had specific intent to kill the victim and performed an act for the purpose of and tending directly toward accomplishing his object. We have determined there is sufficient evidence for the jury to find that the defendant had the specific intent to kill the victim and tried to do that by running over the victim with his vehicle.

37

Louisiana Revised Statutes 14:33 defines a battery as "the intentional use of force or violence upon the person of another." Louisiana Revised Statutes 14:34 defines aggravated battery as "a battery committed with a dangerous weapon."

In order to convict the defendant of the offense of aggravated battery, the state had to prove beyond a reasonable doubt that the defendant used force or violence upon the victim with a dangerous weapon. There is clearly sufficient evidence to establish that the defendant used force or violence against the victim with a dangerous weapon. In this case the dangerous weapon was the vehicle he used to run over the victim.

Louisiana Code of Criminal Procedure Article 814(A)(4) specifies that aggravated battery is a responsive verdict to the charge of attempted second degree murder. While Article 814(C) requires the court to exclude a responsive verdict if the evidence, when viewed in a light most favorable to the prosecution, will not reasonably permit a finding of guilt of the responsive verdict, the evidence in the matter before us does support including aggravated battery as a responsive verdict. Under the facts of this case, aggravated battery is a lesser and included offense to the crime of attempted second degree murder. Proof of the offense of attempted second degree murder also constituted full proof of the offense of aggravated battery.

In *Brown v. Ohio*, 432 U.S. 161, 166, 97 S.Ct. 2221, 2225-26 (1977), the Supreme Court was faced with a similar situation where a defendant had been charged with both auto theft and joyriding, both stemming from the unlawful taking of a vehicle belonging to another. The Court stated in *Brown*:

> The established test for determining whether two offenses are sufficiently distinguishable to permit the imposition of cumulative punishment was stated in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932):
>
> "The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory

provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not. . . . "

This test emphasizes the elements of the two crimes. "If each requires proof of a fact that the other does not, the Blockburger test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes. . . . " *Iannelli v. United States*, 420 U.S. 770, 785 n. 17, 95 S.Ct. 1284, 1294 n. 17, 43 L.Ed.2d 616 (1975).

In applying the *Blockburger* test to the facts before them involving the offense of auto theft and the lesser and included offense of joyriding, the Court further stated:

We are mindful that the Ohio courts "have the final authority to interpret . . . that State's legislation." *Garner v. Louisiana*, 368 U.S. 157, 169, 82 S.Ct. 248, 254, 7 L.Ed.2d 207 (1961). Here the Ohio Court of Appeals has authoritatively defined the elements of the two Ohio crimes: Joyriding consists of taking or operating a vehicle without the owner's consent, and auto theft consists of joyriding with the intent permanently to deprive the owner of possession. App. 22. Joyriding is the lesser included offense. The prosecutor who has established joyriding need only prove the requisite intent in order to establish auto theft; the prosecutor who has established auto theft necessarily has established joyriding as well.

Applying the Blockburger test, we agree with the Ohio Court of Appeals that joyriding and auto theft, as defined by the court, constitute "the same statutory offense" within the meaning of the Double Jeopardy Clause. App. 23. For it is clearly not the case that "each (statute) requires proof of a fact which the other does not." 284 U.S., at 304, 52 S.Ct., at 182. As is invariably true of a greater and lesser included offense, the lesser offense joyriding requires no proof beyond that which is required for conviction of the greater auto theft. The greater offense is therefore by definition the "same" for purposes of double jeopardy as any lesser offense included in it.

*Brown*, 432 U.S. at 167-68.

In the matter before us we have facts that fit squarely within *Brown*'s application of the *Blockburger* test. While attempted second degree murder requires the specific intent to kill and aggravated battery does not, just as the Ohio auto theft statute required the intent to permanently deprive and joyriding did not, the lesser included offense of aggravated battery contains no elements that are not present in the more serious offense of attempted second degree murder. By proving the

39

elements of attempted second degree murder, the state necessarily proved all the elements of aggravated battery.

Analyzing the facts of this case under the *Blockburger* test we conclude that the defendant's convictions of both attempted second degree murder and aggravated battery constitute double jeopardy in violation of the Double Jeopardy Clause.

The remedy when the court finds a violation of the double jeopardy clause is to vacate the conviction for the lesser offense and any sentence imposed for that offense. *State v. Doughty*, 379 So.2d 1088 (La.1980).

Accordingly, the defendant's conviction for the charge of aggravated battery is hereby vacated. The sentence of ten years and the $5,000.00 fine imposed for the aggravated battery conviction are likewise vacated.

## EXCESSIVE SENTENCES/RESTITUTION

In his final assignment of error, the defendant argues the sentences imposed were excessive. Additionally, the defendant asserts the order of restitution was not based upon evidence establishing the actual pecuniary loss to the victim. The trial court imposed a sentence of fifteen years at hard labor without benefit of probation, parole, or suspension of sentence for attempted second degree murder and imposed a sentence of ten years at hard labor for aggravated battery. In addition to the term of imprisonment for aggravated battery, the trial court ordered the defendant to pay a $5,000.00 fine, court costs, and restitution to the victim in the amount of $75,000.00.[2] Finally, the trial court ordered the sentences to run concurrently and recommended the defendant receive mental health treatment while incarcerated. The defendant timely filed a motion to reconsider sentence, alleging the sentences were excessive. The trial court denied the motion without a hearing. Having vacated

---

[2] The trial court ordered Defendant to be given credit for any amount paid through a civil proceeding or through insurance.

the sentence for aggravated battery, we will review only the defendant's sentence for attempted second degree murder and the restitution order.

At the sentencing hearing, defense counsel introduced witnesses on the defendant's behalf. The first witness, Rose Beason, testified that she was a good friend of the defendant, that she had known him for at least ten years, and that she believed him to be a sweet, giving person. Ms. Beason testified that she had never known the defendant to hurt anyone. When asked on cross-examination if she had known the defendant to use narcotics, Ms. Beason replied that she knew the defendant was on pain pills for a back injury. Ms. Beason also believed the defendant suffered from schizophrenia.

The defendant's sister, Nila Painter, testified that the defendant had been diagnosed with a mental disease, which she believed to be paranoid schizophrenia. Ms. Painter understood that the defendant took medicine for the condition. Ms. Painter described the defendant as a good person who worked until he became disabled. When asked what caused the defendant to become disabled, Ms. Painter testified that she believed it was a mental disability.

On cross-examination, the state asked Ms. Painter if she heard the defendant threaten people on a routine basis. Ms. Painter replied:

> A.    He's been very upset with his son, and I've been listening to that and he thinks the world is against him I think as far as the law is concerned.

When pressed, Ms. Painter stated she was not sure, but she believed the defendant expressed his desire to harm certain people when he gets out of jail. Ms. Painter further testified that the defendant had been violent with his wife. As for his access to weapons, Ms. Painter testified that the defendant had several guns. As for an incident involving the defendant and a doctor in Alexandria, the following colloquy took place:

Q.     . . . . Um, was there an incident that occurred in Alexandria just prior to this involving a doctor's office where some threats were made perhaps to get a gun out of the car and take care of some doctors that weren't letting him have - - letting him have his medications he wanted, are you familiar with that?

A.     Not me personally, I - - I've heard hearsay.

Q.     Okay, and the hearsay you heard in - - was involving threats of going back to the car and getting a gun cause - - satisfaction whatever was the problem at the doctor's appointment?

A.     Get his medications, yes, sir.

The defendant's son, Roy Ross, testified that the defendant had been diagnosed with paranoid schizophrenia and bipolar disorder. Roy testified that the defendant had a nervous breakdown when the company he had been working for refused to continue paying his insurance. According to Roy, this happened about a year after the defendant hurt his back in an accident. The defendant checked himself into a hospital and was eventually prescribed several medications – Xanax, Oxycodone, and sleeping pills. Roy testified that the defendant is unable to sleep or sit for long periods of time because of his back. When asked if the defendant suffered from any other medical problems, Roy replied that the defendant takes medication and sees a counselor for his temper. Finally, Roy stated the following:

A.     I'm sorry I wasn't here for your trial and I feel that I failed you as a son because I should have been here. I wish I wouldn't have took the job that I took in Texas so I could be here and I truly apologize from the bottom of my heart.

        BY MR. ROSS:     It's okay son, I ain't guilty. I ain't guilty by no means. Because what I done was done in self-defense. I just didn't have no witnesses, except the lady with the video, so.

On cross-examination, Roy described hardships the defendant suffered by being denied his medications – urinating and "pooping" on himself. Finally, Roy affirmed that he was aware of the incident wherein the defendant threatened to pull a gun on his doctor because his doctor would not give him a shot in his back. Roy

42

acquiesced in the state's indication that the incident with the doctor occurred shortly before the incident in question.

After hearing the above evidence, the trial court asked the parties if restitution was being addressed in some way, for example by a civil proceeding. The state informed the court that there may be an issue with the defendant's insurance company contesting liability since it was an intentional act. The state did not know if the victim had recovered anything.

The trial court stated the following in imposing the sentences:

> BY THE COURT: Okay. Counsel uh, over the course of or through the process of a jury trial, jury [sic] found the defendant, Mr. Ross, guilty of one (1) count of Attempted Second Degree Murder and the Court will note that uh, that charge carries with it a sentencing range of ten (10) year - - a minimum of ten (10) not more than fifty (50), does carry the restrictions that that sentence be without benefit of probation, parole or suspension of sentence.
>
> Mr. Ross was also found guilty of Aggravated Battery, that carries a maximum sentence of up to ten (10) years, it also carries with it a potential fine of five thousand dollars ($5,000.00).
>
> In connection with the sentencing, the Court has uh, reviewed the sentencing guidelines set forth in Code of Criminal Procedure Article 894.1, um, Court will note that the first factor, Subsection A-1 is whether there is an undue risk that during the period of a suspended sentence of probation, the defendant will commit another crime, um, the Court will note that the Attempted Second Degree Murder is without benefit of probation, parole or suspension of sentence.
>
> Uh, with respect to the issue of whether or not the defendant would commit another crime, the Court will note that during the con - - context of the sentencing hearing that there has been some testimony about Mr. Ross not only having a temper issue uh, a history of mental illness but that also he is uh, angry with people related to his incarceration and that he is uh, planning to rectify that when he gets out.
>
> The Court will also note that throughout this entire proceeding Mr. Ross has expressed no remorse whatsoever. He has consistently contended that his actions were justified.
>
> With respect to whether or not the defendant is in need of correctional treatment or custodial environment that can be provided by his commitment to an institution, uh, there has been evidence submitted today in connection with the sentencing hearing that Mr. Ross has a

43

history of mental illness, that he has been previously treat - - been treated for uh, anger issues, schizophrenia, bipolarism uh, he's also been receiving uh, pain management treatment for a back injury uh, apparently Mr. Ross has had some issues with receiving treatment and also receiving his appropriate medical - - prescriptions uh, as testified to by his son.

The Court will note that uh, B-5, one of the factors is whether the offender knowingly created a risk of death or great bodily harm to more than one person. Mr. Ross, the uh, this case was decided by a jury. There were twelve (12) people that listened to all the evidence and they found that the State met it's burden of proof. They believed the testimony of the victim, and also the witnesses that observed portions of what transpired on the highway.

. . . .

BY THE COURT:  . . . . Jury believed the victim, not you. To the extent it matters, I believe the victim, not you. Hypothetically, if the victim got out of his vehicle and put his hand on his weapon or even took his weapon out, you still started it before that hypothetically ever happen [sic], you put people in danger because you were in such a hurry to get home and now we have a idea [sic] why you were in such a hurry to get home because maybe you decided to - - were thinking about going back to visit your doctor.

BY MR. ROSS:  No, sir.

BY THE COURT:  One reason or another, you're in a great hurry to get home so much of a hurry that you can't allow someone to make a safe turn on a four lane highway, you decide to stop and back up against the flow of traffic on a highway that you can't pull over into the right hand lane. So yes, sir, even if we accept your version of what happened, you created an undue risk of harm to everyone on that highway. Because you were going to explain to him how to use a turning lane. Well apparently, Mr. Ross I need you to explain it to me too because I travel down that highway too. I travel down that highway in the left hand lane at sixty-five (65) miles an hour and you can't do it, sir. You can't safely pull into that turning lane and make a safe crossing of that highway at sixty-five (65) miles a hour. And you certainly can't do it with a Mercedes-Benz on your bumper who's upset because he's not going as fast as he wants to go.

Mr. Ross, I don't know what all problems you got, I don't know if you've have [sic] back problems, I don't know if you've got pill problems, I don't know if you've got schizophrenia, I don't know if you've got bipolarism, I don't know if you've got med problems, I don't know if you've got insurance problems, I don't know if you got domestic problems, apparently you and your wife didn't get along, now you and your daughter doesn't [sic] get along. You and your son, off and on. I don't know what all your problems are, sir. But in the fall of

2017 you created a big problem on the highway because you wanted to explain to someone how to use a turning lane. And in - - and in following along with your hypothetical of this gentlemen with his weapon, instead of continuing to back up like you had already done, you decided the best course of action was to put it in drive and run over him. And then if we want to stop, well, I forgot that you were praying for him before you did it. I'll tell you, Mr. Ross, you lost me there. I think you lost the jury too. I didn't ask them, but I suspect they didn't believe you were praying for the victim when you ran over him. I suspect if there were any praying, sir, it occurred when those bullets started hitting the back of your vehicle.

Mr. Ross, we all have problems, sir. But you are a danger to society. Your temper has run off your wife, it's run off your daughter and now it's almost killed a man. Almost killed a man that didn't get off the road fast enough for you.

The defendant reiterates the mitigating evidence of his mental illness that was introduced through the testimony of witnesses at his sentencing hearing. The defendant also notes his trial counsel was denied a continuance of the sentencing hearing to obtain medical records of the defendant's illness. Although the defendant acknowledges there was a prior incident involving the defendant and a doctor's office, the defendant asserts there was no evidence that the defendant committed any act in furtherance of the threat nor was there any evidence the incident occurred on the same day as the incident at issue. The defendant further notes that his son testified at the sentencing hearing that the defendant has sought help for his issues. Even though the jury rejected his claim of self-defense, the defendant contends his belief that he was in danger still amounted to an "imperfect defense" that should have been considered as a mitigating factor. Citing *State v. Dill*, 461 So.2d 1130 (La.App. 5 Cir. 1984), *writ denied*, 475 So.2d 1106 (1985)). Finally, the defendant contends there was no evidence to support the $75,000.00 restitution award to the victim.

The state contends the concurrent sentences totaled a sentence on the lower end of the range for attempted second degree murder. Considering the factors set

forth by the trial court at sentencing, the state argues the trial court did not abuse its

discretion in imposing the sentences in this case. Finally, the State argues the trial

court's restitution award should not be disturbed unless it was a manifest abuse of

discretion. The state contends the award was not a manifest abuse of discretion:

> Considering the surgery required by the victim to put a rod in his broken leg along with the 8 weeks lost wages, the $75,000.00 was not excessive nor an abuse of the trial courts [sic] wide latitude in determining the victim's actual loss. Should this Honorable court find that the trial court abused its discretion in setting the amount, this writer would request a remand to the trial court for a restitution hearing.

*Standard of Review*

As stated previously, the defendant's sole objection to the sentence imposed

was a Motion to Reconsider Sentence that asserted a general excessiveness claim.

Thus, the defendant is limited to a bare excessiveness review on appeal. *State v.*

*Moten*, 14-1169 (La.App. 3 Cir. 3/4/15), 158 So.3d 972, *writ denied*, 15-609 (La.

2/5/16), 186 So.3d 1162. In *State v. Morain*, 08-1546, pp. 2-5 (La.App. 3 Cir.

6/3/09), 11 So.3d 733, 735-36, *writ denied*, 09-1670 (La. 4/30/10), 34 So.3d 282,

this court set forth the following standard to be used in reviewing excessive sentence

claims:

> La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook,* 95-2784

(La.5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

*State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied,* 01-0838 (La.2/1/02), 808 So.2d 331 (alteration in original).

In order to decide whether a sentence shocks the sense of justice or makes no meaningful contribution to acceptable penal goals, we have held that:

> [A]n appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. *State v. Smith,* 99-0606 (La.7/6/00), 766 So.2d 501. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste,* 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La.5/31/96), 674 So.2d 957, 958.

*State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-0562 (La.5/30/03), 845 So.2d 1061.

In *State v. Whatley*, 06-316 (La.App. 3 Cir. 11/2/06), 943 So.2d 601, *writ denied,* 06-2826 (La.8/31/07), 962 So.2d 424, we discussed the factors that a reviewing court should consider in determining if a trial court abused its discretion in imposing a sentence. In *Whatley,* citing *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57, *writ denied*, 99-0433 (La.6/25/99), 745 So.2d 1183, we annunciated three factors that a reviewing court should take into consideration in abuse of discretion cases: (1) the nature of the crime; (2) the nature and background of the offender; and (3) the sentence imposed for similar crimes by the same court and other courts.

The trial court in the present case set forth ample reasons for the sentence imposed. The trial court allowed the defendant to introduce mitigating evidence and weighed that evidence against the evidence presented at trial. Although appellate counsel notes in brief that the trial court denied the defendant's request for a continuance of the sentencing hearing, appellate counsel does not assign any error

as to the denial of the continuance. After hearing the defendant's mitigating evidence and setting forth the factors it considered, the trial court imposed a sentence of fifteen years at hard labor without benefit of probation, parole, or suspension of sentence for attempted second degree murder.

For attempted second degree murder, the defendant was exposed to a sentence of ten to fifty years at hard labor, without benefit of parole, probation, or suspension of sentence. La.R.S. 14:27 and 14:30.1. Thus, the defendant's fifteen-year sentence for attempted second degree murder was near the minimum. We find no error in the sentence imposed for the attempted second-degree murder conviction.

The defendant argues that the record fails to support the restitution award of $75,000.00. We agree. The trial court stated the amount was based on the description of the victim's injuries at trial. The amount was set with absolutely no evidence in the record to support it. There were no medical bills presented, no evidence of lost wages, and no testimony regarding damages of any nature. The court agreed to an arbitrary amount suggested by the state. We find the court erred by ordering restitution with no evidence to support the amount ordered.

Considering the nature of the crimes in the present case, the possible sentences that could have been imposed, and the restriction of this review to a bare excessiveness review, the trial court did not abuse its discretion in imposing the sentence for second degree murder in the present case. Additionally, we note the supreme court's repeated admonition "that sentence review under the Louisiana constitution does not provide an appellate court with a vehicle for substituting its judgment for that of a trial judge as to what punishment is more appropriate in a given case." *State v. Savoy*, 11-1174, p. 5 (La. 7/2/12), 93 So.3d 1279, 1283 (citing *State v. Walker*, 00-3200 (La. 10/12/01), 799 So.2d 461; *State v. Cook*, 95-2784 (La.

5/31/96), 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615 (1996); and

*State v. Humphrey*, 445 So.2d 1155 (La.1984)).

This fifteen-year sentence imposed by the court for the attempted second

degree murder conviction is affirmed.

## <u>CONCLUSION</u>

The defendant's conviction and sentence for attempted second degree murder

are affirmed.  The defendant's conviction and sentence for aggravated battery are

vacated.  The order of restitution is vacated.

**AFFIRMED IN PART, VACATED IN PART.**

49

STATE OF LOUISIANA

VERSUS

JEFFERY WAYNE ROSS

**GREMILLION, Judge**, concurs in part and dissents in part.

I concur with the majority's opinion in all respects except that portion relating to double jeopardy. While I find the rationale behind the majority's reasoning in the double jeopardy analysis persuasive, *Blockburger* and its progeny make clear that the only test is whether each offense requires proof of a fact which the other does not. This analysis is simplified when there are two completely different offenses in question with many differing elements, such as in *State v. Frank*, 16-1160 (La. 10/18/17), 234 So.3d 27, where the defendant was convicted of attempted felony carnal knowledge of a juvenile and malfeasance in office. Even though both offenses arose out of the same transaction and relied on the same evidence, there was no double jeopardy violation because each offense requires proof of facts which the other does not. In *Frank,* the supreme court held that "Louisiana courts are bound only to apply the standard established by the U.S. Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180 (1932), to protect against double jeopardy and can dispense with Louisiana's separate 'same evidence' test." *Id*. at 28.

In this case, the majority claims that the "lesser included offense of aggravated battery contains no elements that are not present in the more serious offense of second degree murder." I disagree. Attempted second degree murder requires proof of specific intent to kill; aggravated battery does not. Aggravated battery requires

commission with a dangerous weapon; attempted second degree murder does not. In *State v. Harrell*, 01-841 (La.App. 5 Cir. 2/26/02), 811 So.2d 1015, the defendant was charged with attempted second degree murder, but found guilty of aggravated battery. The appellate court stated:

> The Louisiana Supreme Court has acknowledged that an essential element of aggravated battery, the lesser crime, is not an essential element of the greater crime, attempted second degree murder. Specifically, the attempted murder does not require the use of force or violence upon the person of the victim nor does it require the use of a dangerous weapon. Thus, the evidence adduced to support the greater offense does not automatically prove the lesser.

*Id.* at 1018. Thus, while aggravated battery is a lesser offense than attempted second degree murder; it is not a lesser included offense.

Recently, the supreme court reiterated the difference between responsive verdicts that are "necessarily a lesser and included grade of the charged offense and those that are not lesser and included offenses but are nevertheless legislatively authorized as responsive verdicts in La. C.Cr.P. art. 814[.]" *State v. Price*, 17-520, p. 5 (La. 6/27/18), 250 So.3d 230, 233 (*quoting State ex rel. Elaire v. Blackburn*, 424 So.2d 246, 248-249 (La.1981). Aggravated battery is a legislatively authorized responsive verdict under Article 814. True lesser included offenses of the charged offense require that all of the elements of the lesser offense are found in the greater offense. *State v. Price*, 250 So.3d 230. In responsive verdicts however, "evidence which would support a conviction of the greater offense would not necessarily support a conviction of the legislatively responsive offense. In such cases, the evidence may be insufficient to establish an essential element of the lesser crime which is not an essential element of the greater crime." *Id.* at 233 (*quoting State ex rel. Elaire*, 424 So.2d at 248-249). Until the legislature changes the statute or the supreme court provides further guidance in this area, I can find no double jeopardy

2

violation under *Blockburger* according to its plain language. *Brown v. Ohio*, 432

U.S. 161, 97 S.Ct. 2221 (1977), is distinguishable because in *Brown*:

> "[e]very element of the crime of operating a motor vehicle without the consent of the owner is also an element of the crime of auto theft. 'The difference between the crime of a stealing a motor vehicle, and operating a motor vehicle without the consent of the owner is that conviction for stealing requires proof of an intent on the part of the thief to permanently deprive the owner of possession.' . . . (T)he crime of operating a motor vehicle without the consent of the owner is a lesser included offense of auto theft . . . . " Id., at 22.

*Id.* at 163-164.

Brown involved a true lesser included offense in that every element of

joyriding was present in auto theft, and joyriding did not include any

additional elements not present in auto theft. In this case, involving a

responsive verdict rather than a lesser included offense, the same elements test

clearly precludes the finding that Defendant was placed in double jeopardy.

For an in-depth discussion of lesser included offenses, the application of

*Blockburger* and *Brown,* and the complex relationship between federal law

and a state's particular characterization of certain crimes, *see* James A.

Shellenberger and James A. Strazella, *The Lesser Included Offense Doctrine*

*and the Constitution: The Development of Due Process and Double Jeopardy*

*Remedies*, 79 Marq. L. Rev. 1 (1995).

Again, while I find the majority's reasoning that a conviction for a

responsive verdict seems to include all the elements of the major crime, the

legislature has not expressly prohibited responsive verdicts from the

*Blockburger* analysis, and the jurisprudence is clear that attempted second

degree murder and aggravated battery have distinct elements. Additionally,

under the specific facts of this case, the jury could have reasonably found that

two distinct acts occurred here: the initial attempt to run over the victim, an

3

aggravated battery, and the reversing to run over him again, attempted second degree murder.  Accordingly, I concur in part and dissent in part.

4

STATE OF LOUISIANA

VERSUS

JEFFERY WAYNE ROSS

Conery, J., concurring in part and dissenting in part.

I join the majority in maintaining the defendant's conviction for attempted second degree murder and in vacating both the conviction for aggravated battery and the related sentence. I further concur in the reversal of the order of restitution. I dissent in part, however, as I find legal error as to the sentencing hearing. As explained below, I would also vacate the defendant's sentence for attempted second degree murder given due process considerations.

Following consideration of the entire transcript in this case, one has to ask, "Was defense counsel sufficiently diligent in his representation to insure his client's right to a fair sentencing hearing?" Or, "Was there a reason for the State to proceed with sentencing so quickly when there were many unanswered questions about the defendant's mental health?"

The majority opinion explains that the underlying incident happened on September 19, 2017. The trial, however, was held on February 20, 2018, only six months later, and the sentencing hearing was conducted on March 29, 2018, just 35 days after the trial. Even if the defendant's medical condition and mental health issues may not have been sufficient to excuse his crime, those medical records and

expert medical testimony were not made available for sentencing purposes. Defense counsel did move to continue the sentencing as, apparently, he had not obtained any doctor's reports or mental health records by the day of sentencing. After the trial judge denied the Motion to Continue, the attorney was not in a position to proffer the evidence or give a meaningful explanation of how those records may have been relevant.

When the defendant's son and sister testified at the sentencing, each gave information about their non-medical knowledge of the defendant's long-standing mental health issues. The prosecutor then cross examined each of them, but not about his mental health issues, instead eliciting harmful hearsay testimony about their father's temper and anger problems, with no medical testimony, medical records or other expert testimony to explain or mitigate his past behavior. No objection was lodged.

Further, during cross examination of the defendant's son and sister, the prosecutor elicited extremely prejudicial other crimes evidence about alleged threats by the defendant against individuals whom he allegedly said he would "get even with" or words to that effect. Again, no objections were lodged.

It is significant that the trial judge used these very hearsay statements in his reasons for sentencing as one of the main factors for his sentence on the attempted second degree murder charge. The trial judge specifically noted that Mr. Ross showed "no remorse" and had threatened others with bodily harm.

Our jurisprudence would seem to preclude us from considering these issues on appeal as to Mr. Ross's conviction, as such issues are usually relegated to "post conviction proceedings" where a full record can be made as to the defense counsel's strategy, and evidence and expert testimony can be introduced. *See*

2

La.Code Crim.P. art. 930; *State v. Durall,* 15-794 (La.App. 5 Cir. 5/12/16), 192 So.3d 285; *State in the Interest of A.B.*, 09-870 (La.App. 3 Cir. 12/9/09), 25 So.3d 1012.

The appellate record in this case, however, sufficiently demonstrates an error of law during sentencing. *See* La.Code Crim.P. art. 920. Specifically, the defendant was never given an opportunity by the trial judge to speak before sentencing. While the defendant was properly admonished by the trial judge not to speak while other witnesses were testifying, the defendant was never afforded an opportunity to speak after those witnesses testified. While it may be true that his attorney didn't call the defendant as a witness at the sentencing hearing, the defendant was not given an **opportunity to speak by the trial court**, as happens in almost every case before sentencing. The words "Do you have anything to say before sentencing?" were never pronounced. To the contrary, when the defendant tried to speak, the trial judge stopped him as follows:

> BY MR. ROSS: Your Honor.
>
> BY THE COURT: Mr. Ross, the hearing is over, sir. It's my turn.
>
> BY MR. ROSS: (Indistinct).
>
> BY THE COURT: Mr. Ross, Mr. Ross, you—you had your opportunity to speak, everyone's had their opportunity to speak, now I get - - now it's my turn.
>
> BY MR. ROSS: I was told to be quiet.
>
> BY THE COURT: Then do it. . . .

While some trial errors by counsel can usually only be corrected in post conviction proceedings, I find that this otherwise conscientious and diligent trial judge did not afford Mr. Ross an opportunity to speak and perhaps rebut some of

3

the extremely prejudicial and damaging information admitted during his sentencing hearing.

Louisiana Constitutional Article 1, § 2 provides "No person shall be deprived of life, liberty, or property, except by due process of law." The Louisiana Supreme Court in *State v. Myles*, 94–0217 (La. 6/3/94), 638 So.2d 218, 219 (per curiam), addressed a defendant's right of due process at sentencing hearings:

> The sources of information relied upon by the sentencing court are varied and may include evidence usually excluded from the courtroom at the trial of guilt or innocence, e.g., hearsay and arrest as well as conviction records. *Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949); *State v. Washington*, 414 So.2d 313 (La.1982); *State v. Brown*, 410 So.2d 1043 (La.1982). Because the scope of information available to the court for sentencing purposes is so broad, the defendant has a due process right to rebut prejudicially false or misleading information which may affect the sentencing determination. *State v. Lockwood*, 439 So.2d 394 (La.1983); *State v. Parish*, 429 So.2d 442 (La.1983); *State v. Underwood*, 353 So.2d 1013 (La.1978).

At the sentencing hearing defense counsel first called as a witness Ms. Beason, a long-time church friend of the defendant. In her testimony, Ms. Beason spoke of her knowledge of the defendant's kindness, specifically noting an instance where he helped a fellow church member monetarily during a hard time. She summed up her opinion of him by stating, "[H]e's a good person." The State then questioned Ms. Beason on her knowledge of the defendant's demeanor and narcotic use, to which she replied that she had never experienced the defendant being violent, and her only knowledge of narcotic use was of medication that had been prescribed to him. The State further questioned Ms. Beason on the defendant's mental health issues, to which she explained that she knew of his diagnosis of schizophrenia. Defense counsel offered no rebuttal.

4

Defense counsel then called Nila Painter, the defendant's sister, who testified that she believed her brother to be a good person and attested to his "generous character[.]" Ms. Painter also gave testimony as to the extent of her knowledge of the defendant's mental diagnosis and his back problems. On cross examination, the State questioned Ms. Painter on her knowledge of any statements or lists allegedly made by the defendant threatening others, and whether he expressed disappointment for not killing the victim. Ms. Painter testified, "yes, uh, I - - he may have, I don't. . . I can't - - I can't say for sure." The State further questioned Ms. Painter, "But you're aware that he's forming an idea while he's incarcerated to harm people when he gets out, is that correct?" To which Ms. Painter replied, "I think he has made that statement, yes." Again, defense counsel offered no objection and no rebuttal.

Lastly, Roy Ross, the defendant's son, testified to his knowledge of the defendant's mental diagnosis, back injury, and the medications prescribed in relation to both his mental disorders and his back pain. Further, Roy testified as to the defendant's previous counseling for temper related issues.

The State cross-examined Roy about his knowledge of any alleged threats or lists made by the defendant. Roy testified, "I didn't know there was a list[,] but he has made comments, but everybody makes comments when they're mad." Immediately following Roy's testimony, the trial court asked if there was anything else, to which defense counsel stated, "I don't have anything else."

However, at no point prior to sentencing did the trial court give **the defendant** the opportunity to speak or rebut any prejudicial information elicited by the State at the sentencing hearing. The only statements that were made by the defendant during the sentencing hearing were those directed to his son following

5

Roy's testimony, and those made during the trial court's questioning of witnesses, when he was told he could not speak by the trial judge as noted earlier.

This court addressed this exact issue in *State v. J.P.F.*, 09-904 (La.App. 3 Cir. 3/3/10), 32 So.3d 1016, finding that the defendant's due process rights were violated when the defendant was not made aware of or given the opportunity to rebut prejudicial information used against him at sentencing. A panel of our court stated as follows:

> The due process rights of a defendant do not stop at mere awareness of the information that will be used against the defendant in sentencing. Although a pre-sentence hearing is not required, the due process guarantee "requires that a defendant be given an opportunity to rebut false or invalid data of a substantial nature, to which the sentencing judge is exposed, where there is a reasonable probability that it may have contributed to the harshness of the sentence." *Telsee*, 388 So.2d at 750 (citing *Richardson*, 377 So.2d 1029; *Bosworth*, 360 So.2d 173; *Underwood*, 353 So.2d 1013)).

> . . . .

> It is true that "[i]n the absence of allegations of mistake or falsehood, evidence of uncharged offenses is admissible and is a valid factor for consideration in sentencing." *State v. Rankin*, 563 So.2d 420, 424 (La.App. 1 Cir.1990). Yet, the issue in this case is not whether the letter containing allegations of similar conduct is admissible or could be relied upon by the sentencing judge. It is whether J.P.F. had an opportunity to deny the allegations. Thus, J.P.F., because he had no notice of these allegations, was not given a chance to even assert mistake or falsehood.

> J.P.F. did not offer any specific refutation of the allegations. Yet, it may have been not because they were true but because J.P.F. had no notice of those allegations, no knowledge of the details of those allegations, and, thus, no opportunity to deny, explain, rebut, or show that they were false. Based on this, not only did J.P.F. not have an opportunity to deny, explain, or rebut these allegations, he also did not have an opportunity to object to their admissibility based on mistake or falsehood. Therefore, the trial court's failure to allow J.P.F. an opportunity to deny, explain, or rebut the allegations of prior similar conduct also constitutes a violation of J.P.F.'s due process rights.

6

*Id.* at 1019-20. *See also State v. Telsee*, 388 So.2d 747 (La.1980); *State v. Bosworth*, 360 So.2d 173 (La.1978).

In light of the arguably improper hearsay evidence that was admitted during sentencing, albeit without his attorney's objection, and especially in light of the fact that the trial judge used that evidence as the major justification for his sentence and specifically prevented the defendant from speaking or otherwise contradicting that evidence, I find that there was a constitutional violation of the defendant's due process right to a fair sentencing hearing. I would reverse the defendant's sentence for attempted second degree murder and remand for resentencing in accordance with the law and this opinion.