NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

22-244

STATE OF LOUISIANA

VERSUS

JOHN D. PASTORICK

**********

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 17-K-2730-A
HONORABLE GREGORY JAMES DOUCET, DISTRICT JUDGE

**********

D. KENT SAVOIE
JUDGE

**********

Court composed of Shannon J. Gremillion, D. Kent Savoie, and Sharon Darville Wilson, Judges.

AFFIRMED.

**Peggy J. Sullivan**
**LA Appellate Project**
**P. O. Box 1481**
**Monroe, LA 71201-1481**
**(318) 855-6038**
**COUNSEL FOR DEFENDANT/APPELLANT:**
   **John D. Pastorick**

**Chad Patrick Pitre**
**District Attorney 27th JDC**
**Kathleen E. Ryan**
**Assistant District Attorney**
**P.O. Drawer 1968**
**Opelousas, LA 70571**
**(337) 948-0551**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
   **State of Louisiana**

**SAVOIE, Judge.**

Defendant, John D. Pastorick, appeals his conviction of attempted manslaughter and corresponding sentence. For the following reasons, we affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

Just after 2:00 a.m. on or about May 29, 2017, Defendant shot seventeen-year-old K.W., who was spending the night with Defendant's sixteen-year-old granddaughter, E.C., at Defendant's home.[1] K.W. suffered from extensive blood loss and internal damage to one of his lungs.

On May 4, 2018, Defendant was charged by bill of information with attempted second degree murder, in violation of La.R.S. 14:27 and 14:30.1. The matter proceeded to trial on February 16, 2022, and Defendant was found guilty of attempted manslaughter, in violation of La.R.S. 14:27 and 14:31. On March 3, 2022, the trial court sentenced Defendant to ten years at hard labor with seven years suspended. On March 7, 2022, the sentence was amended to include the term of probation, and Defendant was placed on three years supervised probation. Defendant filed a motion for appeal on March 15, 2022.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we note that the trial court imposed an illegally lenient sentence by partially suspending Defendant's sentence for attempted manslaughter and placing him on probation. At the time Defendant committed the offense, La.Code Crim.P. art. 893(A) prohibited the suspension of a sentence for an offense designated as a crime of violence.

---

[1]Initials are being used pursuant to La.R.S. 46:1844(W), since, at the time of the offence, the victim was a minor.

La.Code Crim.P. art. 893(A) (2017 version). *See also, State v. Weldon*, 13-285 (La.App. 3 Cir. 10/23/13), 161 So.3d 18. However, because the State has not raised the issue of Defendant's illegally lenient sentence, we will not vacate or otherwise correct Defendant's sentence on appeal. *See, State v. Charles*, 20-498 (La.App. 3 Cir. 5/5/21), 318 So.3d 356. *See also, State v. Brown,* 19-771 (La. 10/14/20), 302 So.3d 1109.

## ASSIGNMENT OF ERROR:

Defendant submits as his sole assignment of error that his "actions fell within the exceptions for justification; and his conviction of attempted manslaughter was not supported by the evidence in this matter." Before discussing Defendant's specific arguments, we note the following testimony from trial.

The State called Michael Darbonne to testify at trial. Darbonne was previously a detective with the St. Landry Parish Sheriff's Office and was the primary investigator of the incident at issue. He testified that in the early morning hours of May 29, 2017, he was dispatched to Shelton Manual Road in response to a report that a male subject had shot another male subject inside of the home. Darbonne stated that upon arriving to the home, he was informed that the victim, K.W., and K.W.'s girlfriend, E.C., had been transported to the hospital. Darbonne described K.W. as a young black male. K.W. was seventeen years old at the time. E.C. is Defendant's granddaughter who was sixteen years old at the time.

Darbonne stated that when he arrived at the scene, those present included Defendant, as well as Desiree Spell, who is Defendant's daughter and E.C.'s mother, Desiree's husband, Desiree's youngest daughter, and several patrol officers.

Darbonne explained that during his investigation, he learned that E.C. and her younger sister were living in Defendant's home at the time, while Mr. and Mrs. Spell were living in a camper on the property. Darbonne also learned that Defendant was staying with his girlfriend in Mamou at the time, but he would sometimes go to his house to retrieve his belongings. After Darbonne interviewed Mr. and Mrs. Spell and Defendant, Defendant was taken to the sheriff's office.

According to Darbonne, K.W. was shot in E.C.'s bedroom in Defendant's house, and a revolver had been placed on the kitchen table before the deputies arrived on the scene. Darbonne explained that he processed the scene, collected the firearm, and swabbed what he believed was K.W.'s blood and a handprint inside the bedroom. Darbonne stated that there was a "fair amount of blood inside the bedroom."

Darbonne testified that he spoke with Defendant at the sheriff's office and informed him of his *Miranda* rights. According to Darbonne, Defendant stated that he wanted to talk to police. Defendant told him that an argument had taken place at his girlfriend's house, so he left her house and returned to his house at around 2:00 a.m.; however, Defendant did not have his keys, so he knocked on the window of E.C.'s bedroom. Defendant admitted he had a firearm in his hand when he knocked on E.C.'s window. E.C. then let him into the house.

Darbonne testified that, according to Defendant, after E.C. let him inside the house, he and E.C. had an argument about dirty dishes that were in the sink. He said that E.C. then went back to her bedroom, and Defendant began throwing dishes in the trashcan. Defendant told Darbonne that he then started walking towards his bedroom with the firearm in his hand, but he heard a scuffle in E.C.'s room. Defendant told Darbonne that he then asked E.C. to open the door, E.C. told

3

him to wait, and Defendant told E.C. he was going to kick down the door if she did not open it. Defendant then told Darbonne that when E.C. opened the door, he looked around and saw a naked male in the room. Defendant told Darbonne that he was not sure who the male was, so he raised his gun and fired a shot because he noticed movement. Darbonne testified that Defendant admitted he shot K.W. in the upper chest.

According to Darbonne, he asked Defendant if he thought E.C. was in distress at the time, and Defendant said he did not know. Darbonne said, "I asked him . . . basically to show that [K.W.] was some type of threat, which he couldn't provide." Darbonne further stated, "[Defendant] said it was just a small room[,] and he noticed a movement[,] and it was basically a quick reaction but he did identify that [K.W.] was a naked black male[,] and he couldn't at any point determine that there was any weapon in [K.W.]'s hand."

Darbonne also testified that he asked Defendant about the relationship between K.W. and E.C. Defendant told him that he had not met K.W. before but that he was aware that E.C. had dated black and males and females before. According to Darbonne, Defendant admitted to being bothered by his granddaughter's relationships.

Darbonne testified that following the incident, he also went to the hospital to speak to K.W. and E.C., who both confirmed some of the information he obtained from Defendant. Darbonne said that E.C. told him that Defendant had walked in and shot her boyfriend. E.C. also told Darbonne that she called 911 twice and reported that her boyfriend, K.W., had been shot.

Darbonne testified that he reviewed the recordings of the 911 calls and could hear E.C. tell Defendant that K.W. was not an intruder, but rather her boyfriend.

4

Darbonne further explained that "[Defendant] can be heard saying, 'Didn't I tell you that would happen,' and E.C. said something to the nature of, 'No, you said you would shoot him. I didn't think you would actually do' or 'You said you would kill him.'"

The State introduced and played the recordings of the two 911 calls. In the recording of the first call, E.C. is heard calling for an ambulance because her "grandfather just shot somebody," and she provided her address. Commotion can be heard in the background, as well as what sounds like groans coming from the victim. E.C. is heard saying, "Wait, hold on, do I just put pressure on it; it's bleeding?" E.C. then reaffirmed the address, and at this point the call ends.

In the recording of the second call, E.C. can be heard asking if someone was coming. She further stated, "Me and my boyfriend were here sleeping[,] and my momma knew[,] and my grandpa walked in and shot my boyfriend in the chest." E.C. continued, "He said he thought he was a burglar, but he was in my room and its 2 o'clock in the morning. And he shot him in the chest." As E.C. is saying this, a muffled background voice that sounded like "burglar" can be heard. E.C. can also be heard in the second recording saying that her boyfriend's chest was hurting and that he could not breathe. She stated that her grandpa was standing in the door and still had the gun in his hand.

At this point in the second call, the sheriff's office was alerted, and E.C. stated that her boyfriend had been shot by her grandfather. E.C. said her boyfriend was bleeding everywhere, and it would not stop. Groans of pain coming from the victim can be heard in the background. E.C. again stated that her grandfather was standing in the doorway. Defendant's voice is then heard, and he said something

5

along the lines of a burglar being in his house. E.C. replied, "He's not a burglar[,] and you didn't have to shoot him. I shoulda got in front of that gun."

After a muffled exchange and what sounded like Defendant saying, "Didn't I tell you what would happen," E.C. is heard saying, "No, you said you was gonna shoot him[,] and I didn't think you were crazy enough to come in here and shoot somebody. You don't do that. That is crazy. You trying to go to jail? He wasn't doing nothing wrong. He's not a burglar." E.C. further identified Defendant as John Pastorick.

Darbonne also testified that during his investigation, he spoke to various witnesses, obtained a statement from Desiree, reviewed the recordings of the 911 calls, and reviewed statements from E.C. stating that Defendant had made racist comments in the past. He explained that after his investigation, he signed an affidavit of probable cause for an arrest for attempted second degree murder.

On cross-examination, Darbonne testified that, according to Defendant, E.C. had dated both black males and females in the past. Darbonne stated he was not aware of Defendant ever shooting or harming any of E.C.'s former dating partners. On re-direct examination, Darbonne testified that Defendant told him that he disapproved of his granddaughter dating black men.

The State also called Desiree Spell to testify at trial. She testified that at the time of the incident, she was living in a camper in the yard of her parents' house, but that she and her husband would cook, bathe, and eat in the house. She explained that E.C. and a younger daughter lived in the house. Desiree testified that Defendant would sometimes stay at his girlfriends' house, he would come and go from the house, and they never knew when he would be there. She also stated

that Defendant would occasionally come in during the early morning hours when everyone was asleep.

Desiree also testified that she and her girls knew E.C. was dating K.W., she knew who he was, and that he was a "black boy." She also said that E.C. had dated black boys before. Desiree said that on the night of the incident, K.W. had prepared dinner for them. She explained that this was not the first time K.W. had been to the house and that he would occasionally spend the night in the house with E.C. Desiree said that E.C. and K.W. had been dating for about three months prior to the incident.

Desiree also testified that she knew E.C. had dated other black boys before; however, she did not bring any other boys home. She also said that Defendant knew that E.C. was dating someone. When asked if Defendant approved of his granddaughter dating black boys, Desiree said, "No, I guess not." Desiree said she never heard Defendant say the "N" word, but her kids told her Defendant said it. When asked if Defendant said racist things in front of her, Desiree said, "Yeah, sometimes." Desiree said that Defendant did not always make racist comments because he had friends who are black.

On cross-examination, Desiree testified that she did not like the person who Defendant was dating and that she was upset with Defendant for disappearing. She testified that Defendant was not a bad father and would get her the things that she wanted. However, according to Desiree, she and Defendant did not talk much.

The State also called E.C. to testify at trial. She testified that, as of the date of trial, she and K.W. had been dating for five years, were living together, and had children together.

E.C. also testified that on the date of the incident, she was sixteen years old, K.W. was seventeen years old, and they had been dating for about two months. She said that at that time, she had her own room in Defendant's home, lived in the home with her sister, and that her mother and "Rusty" lived in a camper in the backyard. E.C. also explained that Defendant was not staying in the home, but rather he would leave for nights, or even weeks, at a time.

E.C. testified that, on the date of the incident, she was with K.W. at Defendant's house during the day, then they went to K.W.'s house for a while, and then they returned to Defendant's house to spend the night.

E.C. explained that she and K.W. would go back and forth between households because K.W.'s parents and E.C.'s mother knew they were dating. She said that her mother knew K.W. and that K.W. would cook and bring them food to the camper. She said "[h]e was always there, like he was always around. She used to go pick him up[,] and we'd go . . . back to my house." E.C. said she and K.W. would stay in the same bedroom, and she was pregnant with her first child during the time of the incident.

E.C. testified that she did not know if Defendant knew she was dating K.W. but that Defendant did know she had dated black men before while E.C. was living in the house; however, only one other guy had gone to her house before.

E.C. testified that on the night of the incident, they had cooked at the house and then went to bed around eleven or twelve o'clock at night. She said that her younger sister was the only other person in the house. She testified that around two o'clock in the morning, she heard someone knocking on her window and realized it was her grandfather when he shined a flashlight into the room and said

8

to open the door.  E.C. said Defendant had a gun in his hand and was wearing his motorcycle club t-shirt when she opened the door.

According to E.C., once she opened the door, Defendant went into the kitchen.  She denied having an argument with Defendant over dirty dishes.  She said there was no argument or words between them, other than she told Defendant she was going back to her room to go to sleep.

E.C. testified that she later heard Defendant beating on her bedroom door and telling her to open it before he beat it down.  She said she responded by telling him she did not have any clothes on, as neither she nor K.W. were dressed at the time.  She stated, "[I] told him I didn't have clothes on so I told him I wasn't going to open it all the way . . . as soon as I unlocked it . . . that's whenever the door opened[,] and as soon as he flicked the light on there was no words, no nothing."  E.C. continued, "No arguments, no who is this, no what's going on, nothing.  He just raised the gun and shot."

She further explained that as Defendant pushed himself into the room, and K.W. was standing between the closet and the bed, she was not concerned about K.W. being in the room since E.C.'s mother knew he was there.  "I knew my stepdad knew he was there . . . [I]t had never been an issue[,] and this has been going on for at least two months so . . . I didn't think, 'Oh, yeah, he's going to come home in the middle of the night[,] and something's going to happen.'"

E.C. further testified that K.W. was not trying to hide or jump out of the window; rather, he was just standing there naked.  E.C. said Defendant's gun was already loaded, and "[h]e literally just raised his hand and shot. . . . He had it in his hand. He lifted it and shot.  There was [sic] no words."

9

E.C. testified that she never told Defendant she was in distress. "[T]here was no ruckus. There was no noise. I wasn't screaming for help. . . . [T]here was no sign that anything would have been going on." E.C. testified that she did not see K.W. make any movements towards Defendant nor did K.W. pick up anything. E.C. stated that K.W. was just standing there, and no words were exchanged.

E.C. said after Defendant shot K.W., Defendant "looked at me and he said, 'What did I tell you was ever going to happen if I caught you dating a N----R," and he said like the word-word, like E-R. He didn't . . . that's how he said it."

E.C. said that while Defendant had never warned her in this way before, Defendant had made racial remarks since she was little. E.C. said he would say racist things such as, "I used to have a friend who would come sleep at my house[,] . . . and she's a mixed girl . . . and he would always ask me why is this black girl in my house[,] and it's just stuff like that ever since growing up." E.C. testified that she would consider Defendant a racist towards black people.

E.C. testified that following the shooting, she tried to help K.W. and called the police, but Defendant walked away to place the gun on the kitchen table and then returned and stood in the doorway and watched. She said, "He watched . . . he waited until the ambulance came and everything. Never tried to leave. He just stood there watching us." E.C. testified that Defendant never tried to assist with the phone call or help K.W., but rather he just stood in the doorway. She also said that once the ambulance arrived, Defendant just stood in the dining room watching, but he did not say anything. She further explained that she was in shock following the shooting, so she did not remember everything that was said between her and Defendant.

On cross-examination, E.C. testified that she was not actively trying to hide the fact that K.W. was in the house. She admitted she did not tell Defendant that K.W. was there, but she "didn't think he was coming to the house to shoot anybody who was in the house." She explained that Defendant never asked her why K.W. was in her room or told her he thought K.W. was a burglar.

As to what Defendant said to her after the incident, E.C. testified, "He said, 'What did I tell you would happen?' he's never actually told me, 'Oh, if I catch you dating a black person, I'm going to shoot them and kill them.' No, he never actually said that to me." E.C. stated that Defendant had made racist remarks prior to the night of incident, but he has "never physically looked at me and said, 'If I ever catch you dating one, I'm going to shoot them.'" She explained that Defendant had been racist before even when her grandmother was living, but "there was nothing he could do because it was my grandmother's house."

The State also called K.W. to testify at trial. His testimony was similar to E.C.'s concerning the events that took place the night of the incident. He also confirmed that he had stayed overnight in the house before and that E.C.'s mom, stepfather, and sister knew that he and E.C. were dating.

K.W. said that on the night of the incident, he was sleeping when Defendant knocked on E.C.'s window, and Defendant woke them up when he asked E.C. to unlock the door. K.W. said that he then heard Defendant say to open the door and that he was determined to come into the room even though E.C. said she was not dressed. According to K.W., he stayed in bed until the door opened, and then he got up because Defendant was coming into the room. He explained, "I didn't have a plan. I wasn't going to just be laying there when he came in there and let him

jump on top of me so I stood up. When I stood up[,] and I looked at him, he shot me."

K.W. testified he did not make any gestures towards Defendant, and he froze when he saw the gun. K.W. said he was completely naked at the time, he did not have anything in his hands, and he did not say anything to Defendant, but Defendant just pulled the trigger. He stated that approximately five seconds passed from the time Defendant came into the room until the time Defendant shot him. K.W. said he has never spoken to Defendant and had never met him prior to the incident.

The defense called John Roark Pastorick, Defendant's son, to testify at trial. He testified that he has never known Defendant to be a racist and would not describe him as such.

John further testified that Defendant is protective over his grandchildren. He explained that Desiree is his half-sister, and that after his stepmother passed away, he visited the house less frequently. John said that E.C. and her sister were living with Defendant in the house because Desiree was deemed an unfit mother. He further indicated that Desiree did not like Defendant dating again, did not like Defendant bringing women into her mother's house, and that Desiree wanted to control the house. John testified that Defendant would tell the grandchildren to get up and clean because Defendant was the only provider after their grandmother passed away, "so he'd work and come back and the kids wouldn't do anything."

John further testified that Defendant was a quiet person who would sometimes raise his voice, but he was not known to lay a hand on his family.

On appeal, Defendant argues that the State failed to meet the burden set forth in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979), as his conduct

was a justifiable defense of persons as contemplated by La.R.S. 14:18 and 14:19. Louisiana Revised Statutes 14:18 provides in part, "The fact that an offender's conduct is justifiable, although otherwise criminal, shall constitute a defense to prosecution for any crime based on that conduct." Under La.R.S. 14:18(7), the defense of justification can be claimed "[w]hen the offender's conduct is in defense of persons or of property under any of the circumstances described in Articles 19 through 22."

Louisiana Revised Statutes 14:19 provides in pertinent part:

A. (1) The use of force or violence upon the person of another is justifiable under either of the following circumstances:

(a) When committed for the purpose of preventing a forcible offense against the person or a forcible offense or trespass against property in a person's lawful possession, provided that the force or violence used must be reasonable and apparently necessary to prevent such offense.

(b)(i) When committed by a person lawfully inside a dwelling, a place of business, or a motor vehicle as defined in R.S. 32:1(40) when the conflict began, against a person who is attempting to make an unlawful entry into the dwelling, place of business, or motor vehicle, or who has made an unlawful entry into the dwelling, place of business, or motor vehicle, and the person using the force or violence reasonably believes that the use of force or violence is necessary to prevent the entry or to compel the intruder to leave the dwelling, place of business, or motor vehicle.

Defendant claims that under the facts and circumstances of this case, he proved by a preponderance of the evidence that his actions were justified. Specifically, he argues that his actions in shooting an unknown person who was standing naked in his sixteen-year-old granddaughter's room at two o'clock in the morning were justified and that, while E.C.'s testimony paints him as a racist who shot her boyfriend because he was black, her testimony fails to account for Defendants' belief that the man was a danger to his two minor granddaughters

13

living in the home. Defendant also notes that no witnesses testified that Defendant knew who E.C. was dating, what race he was, or that he knew E.C.'s mother was allowing her sixteen-year old's boyfriend to sleep in the house with her.

In response, the State argues on appeal that the legal justifications relied upon by Defendant are inapplicable. The State argues that there was no evidence indicating that K.W. entered the residence unlawfully or forcibly, or evidence that Defendant knew or had reason to believe K.W. had unlawfully or forcibly entered the residence.

The State notes that in a case that does not involve a homicide, the issue of self-defense requires a two-part inquiry: (1) an objective inquiry into whether the force used was reasonable under the circumstances, and (2) a subjective inquiry into whether the force was apparently necessary. *State v. Ross*, 18-453 (La.App. 3 Cir. 3/13/19), 269 So.3d 1052, *writ denied*, 19-581 (La. 1/22/20), 291 So.3d 1041. The State also contends that the burden of proof is on the defense to prove self-defense justification by a preponderance of the evidence since the act did not result in death. *Id*.

The State argues it presented ample evidence that Defendant intentionally shot K.W. and that Defendant's actions were not reasonable or subjectively necessary. The State notes that K.W. was not armed with a weapon and made no threatening gestures and that E.C. showed no signs of fear or distress to indicate K.W. was a threat. The State argues Defendant should have inquired as to who K.W. was, but Defendant did not do so because he knew that K.W. was his granddaughter's invited guest and that was the reason Defendant shot him.

As to Defendant's stated belief that K.W. was an intruder, the State questions why, upon realizing the "mistake," Defendant did not render aid, call for

14

an ambulance, or apologize. Rather, the State argues, Defendant "did none of these things because this was no mistake." According to the State, the jury heard, and properly rejected Defendant's justification argument, and the State asks this court not to disturb the jury's determination.

The general analysis for insufficiency of the evidence claims is well-established:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Defendant was charged with attempted second degree murder, in violation of La.R.S. 14:27 and 14:30.1. The jury returned a responsive verdict of attempted manslaughter. Manslaughter is defined as a homicide that would be first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. La. R.S. 14:31. While specific intent to kill is not necessary for a conviction of manslaughter, specific intent to kill is required for a conviction of attempted manslaughter. To support a conviction for attempted manslaughter, the State must prove that the defendant specifically intended to kill

15

the victim and committed an overt act in furtherance of that goal. *State v. Glover,* 47,311 (La.App. 2 Cir.10/10/12), 106 So.3d 129, *writ denied*, 12-2667 (La. 5/24/13), 116 So.3d 659.

Specific intent is that state of mind which exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. *State v. Reed,* 45,237 (La.App. 2 Cir. 5/26/10), 37 So.3d 1116.

> Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

La. R.S. 14:27(A).

"The determination of whether the requisite intent is present in a criminal case is for the trier of fact, and a review of this determination is to be guided by the standards of *Jackson v. Virginia*[.]" *State v. Linnear,* 44,830, p. 6 (La.App 2 Cir.12/9/09), 26 So.3d 303, 306.

As stated above, specific intent to kill may be inferred from the circumstances and Defendant's conduct. Defendant does not contest the fact that he fired a single shot from his revolver, which struck the victim in the chest region. The jury heard from Defendant's granddaughter as well as from K.W., and they both testified that Defendant had a gun in his hand and fired very soon after opening the bedroom door. The bullet struck K.W. in the chest, which caused extensive blood loss and internal damage to one of his lungs.

This court has stated, "It is well-settled that the act of pointing a gun at a person and firing the gun is an indication of the intent to kill that person." *State v.*

16

*Thomas*, 10-269, p. 7 (La.App. 3 Cir. 10/6/10), 48 So.3d 1210, 1215, *writ denied*, 10-2527 (La. 4/1/11), 60 So.3d 1248, *cert. denied*, 565 U.S. 859, 132 S.Ct. 196 (2011); *see also State v. Wright*, 19-456 (La.App. 3 Cir. 12/18/19), 286 So.3d 1176, *writ denied*, 20-262 (La. 7/24/20), 299 So.3d 73. When viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found Defendant had the specific intent to kill K.W.

Defendant argues that his intent to kill was justified under La.R.S. 14:18 and 14:19, because he was acting in self-defense and defense of his granddaughter in believing K.W. was an intruder. Defendant argues that based on the facts of the case, he satisfied his burden of proving self-defense and defense of others by a preponderance of the evidence. As indicated in the State's brief, this court reaffirmed that "the burden of proving self-defense in a non-homicide case rests with the defendant to prove the defense by a preponderance of the evidence." *Ross*, 269 So.3d at 1074. This court additionally reaffirmed that "even when an improper burden of proof may have been imposed on the defendant, courts have been willing to uphold the conviction when the record supported a finding that the defendant did not act in self-defense." *Id* at 1074.

"In a non-homicide case, a claim of self-defense requires a dual inquiry: first, an objective inquiry into whether the force used was reasonable under the circumstances; and, second, a subjective inquiry into whether the force used was apparently necessary." *Ross*, 269 So.3d at 1073, *quoting State v. Barron*, 51,491, p. 13 (La.App. 2 Cir. 8/9/17), 243 So.3d 1178, 1185, *writ denied*, 17-1529 (La. 6/1/18), 243 So.3d 1063.

We find that the record in the instant case supports a finding that Defendant did not act in self-defense or defense of others. The testimony and evidence from

17

trial do not show that the force used was reasonable and apparently necessary to prevent whatever offense Defendant perceived. Defendant claims he heard a scuffle, noticed a handprint on the dresser and lose wires, and saw a naked stranger in his granddaughter's bedroom. Defendant claims he thought this naked stranger was an intruder or a burglar who might cause harm.

However, Darbonne testified that during the interview with Defendant at the station, Defendant failed to give any explanation of what was threatening about the situation other than noticing movement. E.C. testified that K.W. was her boyfriend, who had spent the night at the house on more than one occasion, that her mother and stepfather knew K.W. was spending the night, that Defendant immediately fired his gun once he entered E.C.'s bedroom, and that Defendant told E.C. something like this would happen.

K.W. testified that he was spending the night with E.C., that he was completely naked at the time of the shooting, that E.C.'s mother and stepfather knew he was there, and that he did not say anything or make any threatening motions toward Defendant.

The jury apparently found E.C. and K.W.'s testimony credible and concluded that Defendant had the specific intent to kill K.W. We are unable to say that the jury's assessment was unreasonable or irrational, and we will not disturb the jury's credibility determinations. Accordingly, Defendant's assignment of error lacks merit.

## DECREE

Defendant's conviction and sentence are hereby affirmed.

**AFFIRMED.**

18